# WYGANT ET AL. v. JACKSON BOARD OF EDUCATION ET AL.

No. 84–1340.   Argued November 6, 1985—Decided May 19, 1986

Powell, J., announced the judgment of the Court and delivered an opinion, in which Burger, C. J., and Rehnquist, J., joined, and in all but Part IV of which O'Connor, J., joined. O'Connor, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 284. White, J., filed an opinion concurring in the judgment, *post*, p. 294. Marshall, J., filed a dissenting opinion, in which Brennan and Blackmun, JJ., joined, *post*, p. 295. Stevens, J., filed a dissenting opinion, *post*, p. 313.

*K. Preston Oade, Jr.,* argued the cause for petitioners. With him on the briefs were *Constance E. Brooks* and *Thomas Rasmussen.*

*Jerome A. Susskind* argued the cause and filed a brief for respondents.*

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Acting Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Assistant Attorney General Cooper, Samuel A. Alito, Jr., Walter W. Barnett,* and *David K. Flynn;* for the American Federation of Teach-

JUSTICE POWELL announced the judgment of the Court and delivered an opinion in which THE CHIEF JUSTICE and JUSTICE REHNQUIST join, and in all but Part IV of which JUSTICE O'CONNOR joins.

This case presents the question whether a school board, consistent with the Equal Protection Clause, may extend

ers, AFL–CIO, by *Bruce A. Miller* and *Stuart M. Israel;* for the Anti-Defamation League of B'nai B'rith by *Robert A. Helman, Michele Odorizzi, Daniel M. Harris, Justin J. Finger, Meyer Eisenberg,* and *Jeffrey P. Sinensky;* for Local 36, International Association of Firefighters, AFL–CIO, et al. by *George H. Cohen;* for the Mid-America Legal Foundation by *John M. Cannon, Susan W. Wanat,* and *Ann Plunkett Sheldon;* and for the Pacific Legal Foundation by *Ronald A. Zumbrum* and *John H. Findley.*

Briefs of *amici curiae* urging affirmance were filed for the State of Minnesota et al. by *Hubert H. Humphrey III,* Attorney General of Minnesota, *John R. Tunheim,* Assistant Attorney General, and *Peter M. Ackerberg* and *Jean Boler,* Special Assistant Attorneys General, *John K. Van de Kamp,* Attorney General of California, *William J. Guste, Jr.,* Attorney General of Louisiana, *Robert M. Spire,* Attorney General of Nebraska, *Paul Bardacke,* Attorney General of New Mexico, and *Bronson C. La Follette,* Attorney General of Wisconsin; for the Affirmative Action Coordinating Center et al. by *Jeanny Mirer, Jules Lobel, Frank E. Deale,* and *Anne Simon;* for the Congressional Coalition by *Morgan D. Hodgson, Richard Ruda,* and *Linda C. Kauskay;* for the Greater Boston Civil Rights Coalition by *John Reinstein, Marjorie Heins,* and *Mark A. Michelson;* for the Jackson Education Association by *James A. White;* for the Lawyers' Committee for Civil Rights Under Law et al. by *Walter A. Smith, Jr., R. Claire Guthrie, James Robertson, Harold R. Tyler, Jr., Norman Redlich, Thomas D. Barr, William L. Robinson, Richard T. Seymour, Norman J. Chachkin, Robert Allen Sedler,* and *Burt Neuborne;* for the Mexican American Legal Defense and Educational Fund by *Allen M. Katz, Antonia Hernandez,* and *John E. Huerta;* for the Michigan Civil Rights Commission et al. by *Frank J. Kelley,* Attorney General of Michigan, *Louis J. Caruso,* Solicitor General, and *Felix E. League, Howard E. Golberg,* and *Dianne Rubin,* Assistant Attorneys General; for the National Association for the Advancement of Colored People by *Grover G. Hankins;* for the NAACP Legal Defense and Educational Fund, Inc., by *Julius LeVonne Chambers, Ronald L. Ellis,* and *Eric Schnapper;* for the National Education Association et al. by *Robert H. Chanin;* and for the

270

preferential protection against layoffs to some of its employees because of their race or national origin.

I

In 1972 the Jackson Board of Education, because of racial tension in the community that extended to its schools, considered adding a layoff provision to the Collective Bargaining Agreement (CBA) between the Board and the Jackson Education Association (Union) that would protect employees who were members of certain minority groups against layoffs.[1] The Board and the Union eventually approved a new provision, Article XII of the CBA, covering layoffs. It stated:

> "In the event that it becomes necessary to reduce the number of teachers through layoff from employment by the Board, teachers with the most seniority in the district shall be retained, except that at no time will there be a greater percentage of minority personnel laid off than the current percentage of minority personnel employed at the time of the layoff. In no event will the number given notice of possible layoff be greater than the number of positions to be eliminated. Each teacher so affected will be called back in reverse order for posi-

National School Boards Association by *Gwendolyn H. Gregory, August W. Steinhilber,* and *Thomas A. Shannon.*

Briefs of *amici curiae* were filed for the city of Detroit by *Daniel B. Edelman;* for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell,* and *Thomas R. Bagby;* for the Michigan State Police Troopers Association, Inc., by *Donald L. Reisig* and *Lawrence P. Schneider;* and for the National Board, YMCA of the USA, et al. by *Judith Lichtman.*

[1] Prior to bargaining on this subject, the Minority Affairs Office of the Jackson Public Schools sent a questionnaire to all teachers, soliciting their views as to a layoff policy. The questionnaire proposed two alternatives: continuation of the existing straight seniority system, or a freeze of minority layoffs to ensure retention of minority teachers in exact proportion to the minority student population. Ninety-six percent of the teachers who responded to the questionnaire expressed a preference for the straight seniority system.

tions for which he is certificated maintaining the above minority balance." App. 13.[2]

When layoffs became necessary in 1974, it was evident that adherence to the CBA would result in the layoff of tenured nonminority teachers while minority teachers on probationary status were retained. Rather than complying with Article XII, the Board retained the tenured teachers and laid off probationary minority teachers, thus failing to maintain the percentage of minority personnel that existed at the time of the layoff. The Union, together with two minority teachers who had been laid off, brought suit in federal court, *id.*, at 30 (*Jackson Education Assn.* v. *Board of Education (Jackson I)* (mem. op.)), claiming that the Board's failure to adhere to the layoff provision violated the Equal Protection Clause of the Fourteenth Amendment and Title VII of the Civil Rights Act of 1964. They also urged the District Court to take pendent jurisdiction over state-law contract claims. In its answer the Board denied any prior employment discrimination and argued that the layoff provision conflicted with the Michigan Teacher Tenure Act. App. 33. Following trial, the District Court *sua sponte* concluded that it lacked jurisdiction over the case, in part because there was insufficient evidence to support the plaintiffs' claim that the Board had engaged in discriminatory hiring practices prior to 1972, *id.*, at 35–37, and in part because the plaintiffs had not fulfilled the jurisdictional prerequisite to a Title VII claim by filing discrimination charges with the Equal Employment Opportunity Commission. After dismissing the federal claims, the District Court declined to exercise pendent jurisdiction over the state-law contract claims.

Rather than taking an appeal, the plaintiffs instituted a suit in state court, *Jackson Education Assn.* v. *Board of*

---

[2] Article VII of the CBA defined "minority group personnel" as "those employees who are Black, American Indian, Oriental, or of Spanish descendancy." App. 15.

*Education,* No. 77–011484CZ (Jackson Cty. Cir. Ct. 1979) *(Jackson II),* raising in essence the same claims that had been raised in *Jackson I.* In entering judgment for the plaintiffs, the state court found that the Board had breached its contract with the plaintiffs, and that Article XII did not violate the Michigan Teacher Tenure Act. In rejecting the Board's argument that the layoff provision violated the Civil Rights Act of 1964, the state court found that it "ha[d] not been established that the board had discriminated against minorities in its hiring practices. The minority representation on the faculty was the result of societal racial discrimination." App. 43. The state court also found that "[t]here is no history of overt past discrimination by the parties to this contract." *Id.,* at 49. Nevertheless, the court held that Article XII was permissible, despite its discriminatory effect on nonminority teachers, as an attempt to remedy the effects of societal discrimination.

After *Jackson II,* the Board adhered to Article XII. As a result, during the 1976–1977 and 1981–1982 school years, nonminority teachers were laid off, while minority teachers with less seniority were retained. The displaced nonminority teachers, petitioners here, brought suit in Federal District Court, alleging violations of the Equal Protection Clause, Title VII, 42 U. S. C. § 1983, and other federal and state statutes. On cross-motions for summary judgment, the District Court dismissed all of petitioners' claims. 546 F. Supp. 1195 (ED Mich. 1982). With respect to the equal protection claim,[3] the District Court held that the racial preferences granted by the Board need not be grounded on a finding of prior discrimination. Instead, the court decided that the racial preferences were permissible under the Equal Protection Clause as an attempt to remedy societal discrimination by providing "role models" for minority schoolchildren, and upheld the constitutionality of the layoff provision.

---

[3] Petitioners have sought review in this Court only of their claim based on the Equal Protection Clause.

The Court of Appeals for the Sixth Circuit affirmed, largely adopting the reasoning and language of the District Court. 746 F. 2d 1152 (1984). We granted certiorari, 471 U. S. 1014 (1985), to resolve the important issue of the constitutionality of race-based layoffs by public employers. We now reverse.

## II

Petitioners' central claim is that they were laid off because of their race in violation of the Equal Protection Clause of the Fourteenth Amendment. Decisions by faculties and administrators of public schools based on race or ethnic origin are reviewable under the Fourteenth Amendment.[4] This Court has "consistently repudiated '[d]istinctions between citizens solely because of their ancestry' as being 'odious to a free people whose institutions are founded upon the doctrine of equality,'" *Loving* v. *Virginia*, 388 U. S. 1, 11 (1967), quoting *Hirabayashi* v. *United States*, 320 U. S. 81, 100 (1943). "Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." *University of California Regents* v. *Bakke*, 438 U. S. 265, 291 (1978) (opinion of POWELL, J., joined by WHITE, J.).

The Court has recognized that the level of scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination. *Mississippi University for Women* v. *Hogan*, 458 U. S. 718, 724, n. 9 (1982); *Bakke, supra,* at 291–299; see *Shelley* v. *Kraemer*, 334 U. S. 1, 22 (1948); see also A. Bickel, The Morality of Consent 133 (1975). In this case, Article XII of the CBA operates against whites and in favor of certain minorities, and therefore constitutes a classification based on race. "Any preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does

---

[4] School district collective-bargaining agreements constitute state action for purposes of the Fourteenth Amendment. *Abood* v. *Detroit Board of Ed.*, 431 U. S. 209, 218, and n. 12 (1977).

not conflict with constitutional guarantees." *Fullilove* v. *Klutznick*, 448 U. S. 448, 491 (1980) (opinion of BURGER, C. J.). There are two prongs to this examination. First, any racial classification "must be justified by a compelling governmental interest." *Palmore* v. *Sidoti*, 466 U. S. 429, 432 (1984); see *Loving* v. *Virginia, supra,* at 11; cf. *Graham* v. *Richardson*, 403 U. S. 365, 375 (1971) (alienage). Second, the means chosen by the State to effectuate its purpose must be "narrowly tailored to the achievement of that goal." *Fullilove, supra,* at 480. We must decide whether the layoff provision is supported by a compelling state purpose and whether the means chosen to accomplish that purpose are narrowly tailored.

## III

### A

The Court of Appeals, relying on the reasoning and language of the District Court's opinion, held that the Board's interest in providing minority role models for its minority students, as an attempt to alleviate the effects of societal discrimination, was sufficiently important to justify the racial classification embodied in the layoff provision. 746 F. 2d, at 1156–1157. The court discerned a need for more minority faculty role models by finding that the percentage of minority teachers was less than the percentage of minority students. *Id.,* at 1156.

This Court never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination. This Court's reasoning in *Hazelwood School District* v. *United States*, 433 U. S. 299 (1977), illustrates that the relevant analysis in cases involving proof of discrimination by statistical disparity focuses on those disparities that demonstrate such prior governmental discrimination. In *Hazelwood* the Court concluded that, absent employment

discrimination by the school board, "'nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired.'" *Id.*, at 307, quoting *Teamsters* v. *United States*, 431 U. S. 324, 340, n. 20 (1977). See also 746 F. 2d, at 1160 (Wellford, J., concurring) ("Had the plaintiffs in this case presented data as to the percentage of qualified minority teachers in the relevant labor market to show that defendant Board's hiring of black teachers over a number of years had equalled that figure, I believe this court may well have been required to reverse . . .."). Based on that reasoning, the Court in *Hazelwood* held that the proper comparison for determining the existence of actual discrimination by the school board was "between the racial composition of [the school's] teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market." 433 U. S., at 308. *Hazelwood* demonstrates this Court's focus on prior discrimination as the justification for, and the limitation on, a State's adoption of race-based remedies. See also *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1 (1971).

Unlike the analysis in *Hazelwood*, the role model theory employed by the District Court has no logical stopping point. The role model theory allows the Board to engage in discriminatory hiring and layoff practices long past the point required by any legitimate remedial purpose. Indeed, by tying the required percentage of minority teachers to the percentage of minority students, it requires just the sort of year-to-year calibration the Court stated was unnecessary in *Swann*, 402 U. S., at 31–32:

> "At some point these school authorities and others like them should have achieved full compliance with this Court's decision in *Brown I*. . . . Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition

of student bodies once the affirmative duty to deseg-
regate has been accomplished and racial discrimination
through official action is eliminated from the system."

See also *id.*, at 24.

Moreover, because the role model theory does not neces-
sarily bear a relationship to the harm caused by prior dis-
criminatory hiring practices, it actually could be used to
escape the obligation to remedy such practices by justifying
the small percentage of black teachers by reference to the
small percentage of black students. See *United States* v.
*Hazelwood School District*, 392 F. Supp. 1276, 1286–1287
(ED Mo. 1975), rev'd, 534 F. 2d 805 (CA8 1976), rev'd and
remanded, 433 U. S. 299 (1977). Carried to its logical
extreme, the idea that black students are better off with
black teachers could lead to the very system the Court re-
jected in *Brown* v. *Board of Education*, 347 U. S. 483 (1954)
*(Brown I)*.

Societal discrimination, without more, is too amorphous
a basis for imposing a racially classified remedy. The role
model theory announced by the District Court and the re-
sultant holding typify this indefiniteness. There are numer-
ous explanations for a disparity between the percentage of
minority students and the percentage of minority faculty,
many of them completely unrelated to discrimination of any
kind. In fact, there is no apparent connection between the
two groups. Nevertheless, the District Court combined
irrelevant comparisons between these two groups with an
indisputable statement that there has been societal dis-
crimination, and upheld state action predicated upon racial
classifications. No one doubts that there has been serious
racial discrimination in this country. But as the basis for im-
posing discriminatory *legal* remedies that work against inno-
cent people, societal discrimination is insufficient and over-
expansive. In the absence of particularized findings, a court
could uphold remedies that are ageless in their reach into the
past, and timeless in their ability to affect the future.

## B

Respondents also now argue that their purpose in adopting the layoff provision was to remedy prior discrimination against minorities by the Jackson School District in hiring teachers. Public schools, like other public employers, operate under two interrelated constitutional duties. They are under a clear command from this Court, starting with *Brown* v. *Board of Education*, 349 U. S. 294 (1955), to eliminate every vestige of racial segregation and discrimination in the schools. Pursuant to that goal, race-conscious remedial action may be necessary. *North Carolina State Board of Education* v. *Swann*, 402 U. S. 43, 46 (1971). On the other hand, public employers, including public schools, also must act in accordance with a "core purpose of the Fourteenth Amendment" which is to "do away with all governmentally imposed discriminations based on race." *Palmore* v. *Sidoti*, 466 U. S., at 432. These related constitutional duties are not always harmonious; reconciling them requires public employers to act with extraordinary care. In particular, a public employer like the Board must ensure that, before it embarks on an affirmative-action program, it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination.

Evidentiary support for the conclusion that remedial action is warranted becomes crucial when the remedial program is challenged in court by nonminority employees. In this case, for example, petitioners contended at trial that the remedial program—Article XII—had the purpose and effect of instituting a racial classification that was not justified by a remedial purpose. 546 F. Supp., at 1199. In such a case, the trial court must make a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary. The ultimate burden remains with the employees to demonstrate the unconstitu-

tionality of an affirmative-action program. But unless such a determination is made, an appellate court reviewing a challenge by nonminority employees to remedial action cannot determine whether the race-based action is justified as a remedy for prior discrimination.

Despite the fact that Article XII has spawned years of litigation and three separate lawsuits, no such determination ever has been made. Although its litigation position was different, the Board in *Jackson I* and *Jackson II* denied the existence of prior discriminatory hiring practices. App. 33. This precise issue was litigated in both those suits. Both courts concluded that any statistical disparities were the result of general societal discrimination, not of prior discrimination by the Board. The Board now contends that, given another opportunity, it could establish the existence of prior discrimination. Although this argument seems belated at this point in the proceedings, we need not consider the question since we conclude below that the layoff provision was not a legally appropriate means of achieving even a compelling purpose.[5]

---

[5] JUSTICE MARSHALL contends that "the plurality has too quickly assumed the absence of a legitimate factual predicate . . . for affirmative action in the Jackson schools," *post*, at 297. In support of that assertion, he engages in an unprecedented reliance on nonrecord documents that respondent has "lodged" with this Court. This selective citation to factual materials not considered by the District Court or the Court of Appeals below is unusual enough by itself. My disagreement with JUSTICE MARSHALL, however, is more fundamental than any disagreement over the heretofore unquestioned rule that this Court decides cases based on the record before it. JUSTICE MARSHALL does not define what he means by "legitimate factual predicate," nor does he demonstrate the relationship of these nonrecord materials to his undefined predicate. If, for example, his dissent assumes that general societal discrimination is a sufficient factual predicate, then there is no need to refer to respondents' lodgings as to its own employment history. No one disputes that there has been race discrimination in this country. If that fact alone can justify race-conscious action by the State, despite the Equal Protection Clause, then the dissent need not rely on nonrecord materials to show a "legitimate factual predi-

## IV

The Court of Appeals examined the means chosen to accomplish the Board's race-conscious purposes under a test of "reasonableness." That standard has no support in the decisions of this Court. As demonstrated in Part II above, our decisions always have employed a more stringent standard—however articulated—to test the validity of the means chosen by a State to accomplish its race-conscious purposes. See, *e. g.*, *Palmore, supra*, at 432 ("[T]o pass constitutional muster, [racial classifications] must be 'necessary . . . to the accomplishment' of their legitimate purpose") (quoting *McLaughlin* v. *Florida*, 379 U. S. 184, 196 (1964)); *Fullilove*, 448 U. S., at 480 (opinion of BURGER, C. J.) ("We recognize the need for careful judicial evaluation to assure that any . . . program that employs racial or ethnic criteria to accomplish

---

cate." If, on the other hand, JUSTICE MARSHALL is assuming that the necessary factual predicate is prior discrimination by the Board, there is no escaping the need for a factual determination below—a determination that does not exist.

The real dispute, then, is not over the state of the record. It is disagreement as to what constitutes a "legitimate factual predicate." If the necessary factual predicate is *prior discrimination*—that is, that race-based state action is taken to remedy prior discrimination by the governmental unit involved—then the very nature of appellate review requires that a factfinder determine whether the employer was justified in instituting a remedial plan. Nor can respondents unilaterally insulate themselves from this key constitutional question by conceding that they have discriminated in the past, now that it is in their interest to make such a concession. Contrary to the dissent's assertion, the requirement of such a determination by the trial court is not some arbitrary barrier set up by today's opinion. Rather, it is a necessary result of the requirement that race-based state action be remedial.

At any rate, much of the material relied on by JUSTICE MARSHALL has been the subject of the previous lawsuit in *Jackson II*, where the court concluded that it "had not been established that the board had discriminated against minorities in its hiring practices." App. 43. Moreover, as noted *supra*, at 271, in *Jackson I* the Board expressly denied that it had engaged in employment discrimination.

the objective of remedying the present effects of past discrimination is narrowly tailored to the achievement of that goal").[6]    Under strict scrutiny the means chosen to accomplish the State's asserted purpose must be specifically and narrowly framed to accomplish that purpose.  *Fullilove*, 448 U. S., at 480 (opinion of BURGER, C. J.).[7]    "Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification."  *Id.*, at 537 (STEVENS, J., dissenting).

We have recognized, however, that in order to remedy the effects of prior discrimination, it may be necessary to take race into account.    As part of this Nation's dedication to

---

[6] The term "narrowly tailored," so frequently used in our cases, has acquired a secondary meaning.    More specifically, as commentators have indicated, the term may be used to require consideration of whether lawful alternative and less restrictive means could have been used.    Or, as Professor Ely has noted, the classification at issue must "fit" with greater precision than any alternative means.    Ely, The Constitutionality of Reverse Racial Discrimination, 41 U. Chi. L. Rev. 723, 727, n. 26 (1974).    "[Courts] should give particularly intense scrutiny to whether a nonracial approach or a more narrowly-tailored racial classification could promote the substantial interest about as well and at tolerable administrative expense."  Greenawalt, Judicial Scrutiny of "Benign" Racial Preference in Law School Admissions, 75 Colum. L. Rev. 559, 578–579 (1975).

[7] Several commentators have emphasized that, no matter what the weight of the asserted governmental purpose, the *means* chosen to accomplish the purpose should be narrowly tailored.    In arguing for a form of intermediate scrutiny, Professor Greenawalt contends that, "while benign racial classifications call for some weighing of the importance of ends they call for even more intense scrutiny of means, especially of the administrability of less onerous alternative classifications."    Greenawalt, *supra*, at 565.    Professor Ely has suggested that "special scrutiny in the suspect classification context has in fact consisted not in weighing ends but rather in insisting that the classification in issue fit a constitutionally permissible state goal with greater precision than any available alternative."    Ely, *supra*, at 727, n. 26.    Professor Gunther argues that judicial scrutiny of legislative means is more appropriate than judicial weighing of the importance of the legislative purpose.    Gunther, The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model For a Newer Equal Protection, 86 Harv. L. Rev. 1, 20–21 (1972).

eradicating racial discrimination, innocent persons may be called upon to bear some of the burden of the remedy. "When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such a 'sharing of the burden' by innocent parties is not impermissible." *Id.*, at 484, quoting *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 777 (1976).[8]   In *Fullilove*, the challenged

[8] Of course, when a State implements a race-based plan that requires such a sharing of the burden, it cannot justify the discriminatory effect on some individuals because other individuals had approved the plan. Any "waiver" of the right not to be dealt with by the government on the basis of one's race must be made by those affected. Yet JUSTICE MARSHALL repeatedly contends that the fact that Article XII was approved by a majority vote of the Union somehow validates this plan. He sees this case not in terms of individual constitutional rights, but as an allocation of burdens "between two racial groups." *Post*, at 309. Thus, Article XII becomes a political compromise that "avoided placing the entire burden of layoffs on either the white teachers as a group or the minority teachers as a group." *Post*, at 299. But the petitioners before us today are not "the white teachers as a group." They are Wendy Wygant and other individuals who claim that they were fired from their jobs because of their race. That claim cannot be waived by petitioners' more senior colleagues. In view of the way union seniority works, it is not surprising that while a straight freeze on minority layoffs was overwhelmingly rejected, a "compromise" eventually was reached that placed the entire burden of the compromise on the most junior union members. The more senior union members simply had nothing to lose from such a compromise. See *ibid.* ("To petitioners, at the bottom of the seniority scale among white teachers, fell the lot of bearing the white group's proportionate share of layoffs that became necessary in 1982.") The fact that such a painless accommodation was approved by the more senior union members six times since 1972 is irrelevant. The Constitution does not allocate constitutional rights to be distributed like bloc grants within discrete racial groups; and until it does, petitioners' more senior union colleagues cannot vote away petitioners' rights.

JUSTICE MARSHALL also attempts to portray the layoff plan as one that has no real invidious effect, stating that "within the confines of constant minority proportions, it preserves the hierarchy of seniority in the selection of individuals for layoff." *Post*, at 309. That phrase merely expresses the tautology that layoffs are based on seniority except as to those nonminority teachers who are displaced by minority teachers with less seniority. This is really nothing more than group-based analysis: "[E]ach

statute required at least 10 percent of federal public works funds to be used in contracts with minority-owned business enterprises. This requirement was found to be within the remedial powers of Congress in part because the "actual 'burden' shouldered by nonminority firms is relatively light." 448 U. S., at 484.[9]

Significantly, none of the cases discussed above involved layoffs.[10] Here, by contrast, the means chosen to achieve the Board's asserted purposes is that of laying off nonminority teachers with greater seniority in order to retain minority teachers with less seniority. We have previously expressed concern over the burden that a preferential-layoffs scheme imposes on innocent parties. See *Firefighters* v. *Stotts*, 467 U. S. 561, 574–576, 578–579 (1984); see also *Steelworkers* v. *Weber*, 443 U. S. 193, 208 (1979) ("The plan does not require the discharge of white workers and their replacement with new black hirees"). In cases involving valid *hiring* goals, the burden to be borne by innocent individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. De-

group would shoulder a portion of [the layoff] burden equal to its portion of the faculty." *Post*, at 299. The constitutional problem remains: the decision that petitioners would be laid off was based on their race.

[9] Similarly, the Court approved the hiring program in *Steelworkers* v. *Weber*, 443 U. S. 193, 208 (1979), in part because the plan did not "unnecessarily trammel the interests of the white employees." Since *Weber* involved a private company, its reasoning concerning the validity of the hiring plan at issue there is not directly relevant to this case, which involves a state-imposed plan. No equal protection claim was presented in *Weber*.

[10] There are cases involving alteration of strict seniority layoffs, see, *e. g.*, *Ford Motor Co.* v. *Huffman*, 345 U. S. 330 (1953); *Aeronautical Industrial District Lodge 727* v. *Campbell*, 337 U. S. 521 (1949), but they do not involve the critical element here—layoffs based on race. The Constitution does not require layoffs to be based on strict seniority. But it does require the State to meet a heavy burden of justification when it implements a layoff plan based on race.

nial of a future employment opportunity is not as intrusive as loss of an existing job.

Many of our cases involve union seniority plans with employees who are typically heavily dependent on wages for their day-to-day living. Even a temporary layoff may have adverse financial as well as psychological effects. A worker may invest many productive years in one job and one city with the expectation of earning the stability and security of seniority. "At that point, the rights and expectations surrounding seniority make up what is probably the most valuable capital asset that the worker 'owns,' worth even more than the current equity in his home." Fallon & Weiler, Conflicting Models of Racial Justice, 1984 S. Ct. Rev. 1, 58. Layoffs disrupt these settled expectations in a way that general hiring goals do not.

While hiring goals impose a diffuse burden, often foreclosing only one of several opportunities,[11] layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives. That burden is too intrusive. We therefore hold that, as a means of accomplishing purposes that otherwise may be legitimate, the Board's layoff plan is not sufficiently narrowly tailored.[12] Other, less intrusive means of accomplishing

[11] The "school admission" cases, which involve the same basic concepts as cases involving hiring goals, illustrate this principle. For example, in *DeFunis* v. *Odegaard*, 416 U. S. 312 (1974), while petitioner's complaint alleged that he had been denied admission to the University of Washington Law School because of his race, he also had been accepted at the Oregon, Idaho, Gonzaga, and Willamette Law Schools. *DeFunis* v. *Odegaard*, 82 Wash. 2d 11, 30, n. 11, 507 P. 2d 1169, 1181, n. 11 (1973). The injury to DeFunis was not of the same kind or degree as the injury that he would have suffered had he been removed from law school in his third year. Even this analogy may not rise to the level of harm suffered by a union member who is laid off.

[12] We have recognized, however, that in order to provide make-whole relief to the actual, identified victims of individual discrimination, a court may in an appropriate case award competitive seniority. See *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747 (1976).

similar purposes—such as the adoption of hiring goals—are available. For these reasons, the Board's selection of layoffs as the means to accomplish even a valid purpose cannot satisfy the demands of the Equal Protection Clause.[18]

## V

We accordingly reverse the judgment of the Court of Appeals for the Sixth Circuit.

*It is so ordered.*

JUSTICE O'CONNOR, concurring in part and concurring in the judgment.

This case requires us to define and apply the standard required by the Equal Protection Clause when a governmental agency agrees to give preferences on the basis of race or national origin in making layoffs of employees. The specific question posed is, as JUSTICE MARSHALL puts it, "whether the Constitution prohibits a union and a local school board from developing a collective-bargaining agreement that apportions layoffs between two racially determined groups as a means of preserving the effects of an affirmative hiring policy." *Post*, at 300 (dissenting). There is no issue here of the interpretation and application of Title VII of the Civil Rights Act of 1964; accordingly, we have only the constitutional issue to resolve.

The Equal Protection Clause standard applicable to racial classifications that work to the disadvantage of "non-minorities" has been articulated in various ways. See, *e. g.*, *post*, at 301–302 (MARSHALL, J., dissenting). JUSTICE POW-

---

[18] The Board's definition of minority to include blacks, Orientals, American Indians, and persons of Spanish descent, n. 2, *supra*, further illustrates the undifferentiated nature of the plan. There is no explanation of why the Board chose to favor these particular minorities or how in fact members of some of the categories can be identified. Moreover, respondents have never suggested—much less formally found—that they have engaged in prior, purposeful discrimination against members of each of these minority groups.

ELL now would require that: (1) the racial classification be justified by a "'compelling governmental interest,'" and (2) the means chosen by the State to effectuate its purpose be "narrowly tailored." *Ante*, at 274. This standard reflects the belief, apparently held by all Members of this Court, that racial classifications of any sort must be subjected to "strict scrutiny," however defined. See, *e. g.*, *Fullilove* v. *Klutznick*, 448 U. S. 448, 491 (1980) (opinion of BURGER, C. J., joined by WHITE, J.) ("Any preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees"); *id.*, at 537 (STEVENS, J., dissenting) ("Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification"); *University of California Regents* v. *Bakke*, 438 U. S. 265, 291 (1978) (opinion of POWELL, J., joined by WHITE, J.) ("Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination"); *id.*, at 361–362 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.) ("[O]ur review under the Fourteenth Amendment should be strict—not '"strict" in theory and fatal in fact,' because it is stigma that causes fatality—but strict and searching nonetheless"). JUSTICES MARSHALL, BRENNAN, and BLACKMUN, however, seem to adhere to the formulation of the "strict" standard that they authored, with JUSTICE WHITE, in *Bakke:* "remedial use of race is permissible if it serves 'important governmental objectives' and is 'substantially related to achievement of those objectives.'" *Post*, at 301–302 (MARSHALL, J., dissenting), quoting *Bakke, supra*, at 359 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.).

I subscribe to JUSTICE POWELL's formulation because it mirrors the standard we have consistently applied in examining racial classifications in other contexts. In my view,

> "the analysis and level of scrutiny applied to determine the validity of [a racial] classification do not vary simply

because the objective appears acceptable to individual Members of the Court. While the validity and importance of the objective may affect the outcome of the analysis, the analysis itself does not change." *Mississippi University for Women* v. *Hogan,* 458 U. S. 718, 724, n. 9 (1982).

Although JUSTICE POWELL's formulation may be viewed as more stringent than that suggested by JUSTICES BRENNAN, WHITE, MARSHALL, and BLACKMUN, the disparities between the two tests do not preclude a fair measure of consensus. In particular, as regards certain state interests commonly relied upon in formulating affirmative action programs, the distinction between a "compelling" and an "important" governmental purpose may be a negligible one. The Court is in agreement that, whatever the formulation employed, remedying past or present racial discrimination by a state actor is a sufficiently weighty state interest to warrant the remedial use of a carefully constructed affirmative action program. This remedial purpose need not be accompanied by contemporaneous findings of actual discrimination to be accepted as legitimate as long as the public actor has a firm basis for believing that remedial action is required. See *infra,* at 289–293; *ante,* at 277–278. See also *post,* at 305 (MARSHALL, J., dissenting). Additionally, although its precise contours are uncertain, a state interest in the promotion of racial diversity has been found sufficiently "compelling," at least in the context of higher education, to support the use of racial considerations in furthering that interest. See, *e. g., Bakke, supra,* at 311–315 (opinion of POWELL, J.). See also *post,* at 306 (MARSHALL, J., dissenting); *post,* at 315–317 (STEVENS, J., dissenting). And certainly nothing the Court has said today necessarily forecloses the possibility that the Court will find other governmental interests which have been relied upon in the lower courts but which have not been passed on here to be sufficiently "important" or "compelling" to sustain the use of affirmative action policies.

It appears, then, that the true source of disagreement on the Court lies not so much in defining the state interests which may support affirmative action efforts as in defining the degree to which the means employed must "fit" the ends pursued to meet constitutional standards. See, *e. g.*, *ante*, at 280, nn. 6, 7. Yet even here the Court has forged a degree of unanimity; it is agreed that a plan need not be limited to the remedying of specific instances of identified discrimination for it to be deemed sufficiently "narrowly tailored," or "substantially related," to the correction of prior discrimination by the state actor. See *infra*, at 289; *ante*, at 277–278; *post*, at 305 (MARSHALL, J., dissenting).

In the final analysis, the diverse formulations and the number of separate writings put forth by various Members of the Court in these difficult cases do not necessarily reflect an intractable fragmentation in opinion with respect to certain core principles. Ultimately, the Court is at least in accord in believing that a public employer, consistent with the Constitution, may undertake an affirmative action program which is designed to further a legitimate remedial purpose and which implements that purpose by means that do not impose disproportionate harm on the interests, or unnecessarily trammel the rights, of innocent individuals directly and adversely affected by a plan's racial preference.

Respondent School Board argues that the governmental purpose or goal advanced here was the School Board's desire to correct apparent prior employment discrimination against minorities while avoiding further litigation. See, *e. g.*, Brief for Respondents 15–17. See also Defendant's Brief in Support of Motion for Summary Judgment and Motion to Dismiss in No. Civ. 81–8173249 (ED Mich.), p. 16 (hereinafter cited as Defendant's Summary Judgment Brief). The Michigan Civil Rights Commission determined that the evidence before it supported the allegations of discrimination on the part of the Jackson School Board, though that determination was never reduced to formal findings because the School Board,

with the agreement of the Jackson Education Association (Union), voluntarily chose to remedy the perceived violation. Among the measures the School Board and the Union eventually agreed were necessary to remedy the apparent prior discrimination was the layoff provision challenged here; they reasoned that without the layoff provision, the remedial gains made under the ongoing hiring goals contained in the collective bargaining agreement could be eviscerated by layoffs.

The District Court and the Court of Appeals did not focus on the School Board's unquestionably compelling interest in remedying its apparent prior discrimination when evaluating the constitutionality of the challenged layoff provision. Instead, both courts reasoned that the goals of remedying "societal discrimination" and providing "role models" were sufficiently important to withstand equal protection scrutiny. I agree with the plurality that a governmental agency's interest in remedying "societal" discrimination, that is, discrimination not traceable to its own actions, cannot be deemed sufficiently compelling to pass constitutional muster under strict scrutiny. See *ante*, at 276. See also *Bakke*, 438 U. S., at 307 (opinion of POWELL, J.). I also concur in the plurality's assessment that use by the courts below of a "role model" theory to justify the conclusion that this plan had a legitimate remedial purpose was in error.* See *ante*, at 275–276. Thus, in my view, the District Court and the Court of Appeals clearly erred in relying on these purposes and in failing to give greater attention to the School

---

*The goal of providing "role models" discussed by the courts below should not be confused with the very different goal of promoting racial diversity among the faculty. Because this latter goal was not urged as such in support of the layoff provision before the District Court and the Court of Appeals, however, I do not believe it necessary to discuss the magnitude of that interest or its applicability in this case. The only governmental interests at issue here are those of remedying "societal" discrimination, providing "role models," and remedying apparent prior employment discrimination by the School Board.

Board's asserted purpose of rectifying its own apparent discrimination.

The error of the District Court and the Court of Appeals can be explained by reference to the fact that the primary issue argued by the parties on the cross motions for summary judgment was whether the School Board, a court, or another competent body had to have made a finding of past discrimination before or at the time of the institution of the plan in order for the plan to be upheld as remedial in purpose. 546 F. Supp. 1195, 1199–1200 (ED Mich. 1982). See also Brief in Support of Plaintiff's Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment in No. Civ. 81–8173249 (ED Mich.), pp. 5–13; Defendant's Summary Judgment Brief 11–15. The courts below ruled that a particularized, contemporaneous finding of discrimination was not necessary and upheld the plan as a remedy for "societal" discrimination, apparently on the assumption that in the absence of a specific, contemporaneous finding, any discrimination addressed by an affirmative action plan could only be termed "societal." See, *e. g.*, 546 F. Supp., at 1199. I believe that this assumption is false and therefore agree with the plurality that a contemporaneous or antecedent finding of past discrimination by a court or other competent body is not a constitutional prerequisite to a public employer's voluntary agreement to an affirmative action plan. See *ante,* at 277–278.

A violation of federal statutory or constitutional requirements does not arise with the making of a finding; it arises when the wrong is committed. Contemporaneous findings serve solely as a means by which it can be made absolutely certain that the governmental actor truly is attempting to remedy its own unlawful conduct when it adopts an affirmative action plan, rather than attempting to alleviate the wrongs suffered through general societal discrimination. See, *e. g.*, *Fullilove* v. *Klutznick,* 448 U. S., at 498 (POWELL, J., concurring). Such findings, when voluntarily made

by a public employer, obviously are desirable in that they provide evidentiary safeguards of value both to nonminority employees and to the public employer itself, should its affirmative action program be challenged in court. If contemporaneous findings were *required* of public employers in every case as a precondition to the constitutional validity of their affirmative action efforts, however, the relative value of these evidentiary advantages would diminish, for they could be secured only by the sacrifice of other vitally important values.

The imposition of a requirement that public employers make findings that they have engaged in illegal discrimination before they engage in affirmative action programs would severely undermine public employers' incentive to meet voluntarily their civil rights obligations. See, *e. g., Bakke, supra,* at 364 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.). Cf. *Steelworkers* v. *Weber,* 443 U. S. 193, 210–211 (1979) (BLACKMUN, J., concurring). This result would clearly be at odds with this Court's and Congress' consistent emphasis on "the value of voluntary efforts to further the objectives of the law." *Bakke, supra,* at 364 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.); see also *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 417–418 (1975); *Alexander* v. *Gardner-Denver Co.,* 415 U. S. 36, 44 (1974). The value of voluntary compliance is doubly important when it is a public employer that acts, both because of the example its voluntary assumption of responsibility sets and because the remediation of governmental discrimination is of unique importance. See S. Rep. No. 92–415, p. 10 (1971) (accompanying the amendments extending coverage of Title VII to the States) ("Discrimination by government . . . serves a doubly destructive purpose. The exclusion of minorities from effective participation in the bureaucracy not only promotes ignorance of minority problems in that particular community, but also creates mistrust, alienation, and all too often hostility toward the entire process of government").

Imposing a contemporaneous findings requirement would produce the anomalous result that what private employers may voluntarily do to correct apparent violations of Title VII, *Steelworkers* v. *Weber, supra,* public employers are constitutionally forbidden to do to correct their statutory and constitutional transgressions.

Such results cannot, in my view, be justified by reference to the incremental value a contemporaneous findings requirement would have as an evidentiary safeguard. As is illustrated by this case, public employers are trapped between the competing hazards of liability to minorities if affirmative action *is not* taken to remedy apparent employment discrimination and liability to nonminorities if affirmative action *is* taken. Where these employers, who are presumably fully aware both of their duty under federal law to respect the rights of *all* their employees and of their potential liability for failing to do so, act on the basis of information which gives them a sufficient basis for concluding that remedial action is necessary, a contemporaneous findings requirement should not be necessary.

This conclusion is consistent with our previous decisions recognizing the States' ability to take voluntary race-conscious action to achieve compliance with the law even in the absence of a specific finding of past discrimination. See, *e. g., United Jewish Organizations of Williamsburgh, Inc.* v. *Carey,* 430 U. S. 144, 165–166 (1977) (reapportionment); *McDaniel* v. *Barresi,* 402 U. S. 39 (1971) (school desegregation). Indeed, our recognition of the responsible state actor's competency to take these steps is assumed in our recognition of the States' constitutional *duty* to take affirmative steps to eliminate the continuing effects of past unconstitutional discrimination. See, *e. g., Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 15 (1971); *Green* v. *New Kent County School Board,* 391 U. S. 430, 437–438 (1968).

Of course, as JUSTICE POWELL notes, the public employer must discharge this sensitive duty with great care; in order to provide some measure of protection to the interests of its nonminority employees and the employer itself in the event that its affirmative action plan is challenged, the public employer must have a firm basis for determining that affirmative action is warranted. Public employers are not without reliable benchmarks in making this determination. For example, demonstrable evidence of a disparity between the percentage of qualified blacks on a school's teaching staff and the percentage of qualified minorities in the relevant labor pool sufficient to support a prima facie Title VII pattern or practice claim by minority teachers would lend a compelling basis for a competent authority such as the School Board to conclude that implementation of a voluntary affirmative action plan is appropriate to remedy apparent prior employment discrimination.

To be sure, such a conclusion is not unassailable. If a voluntary affirmative action plan is subsequently challenged in court by nonminority employees, those employees must be given the opportunity to prove that the plan does not meet the constitutional standard this Court has articulated. However, as the plurality suggests, the institution of such a challenge does not automatically impose upon the public employer the burden of convincing the court of its liability for prior unlawful discrimination; nor does it mean that the court must make an actual finding of prior discrimination based on the employer's proof before the employer's affirmative action plan will be upheld. See *ante*, at 277–278. In "reverse discrimination" suits, as in any other suit, it is the plaintiffs who must bear the burden of demonstrating that their rights have been violated. The findings a court must make before upholding an affirmative action plan reflect this allocation of proof and the nature of the challenge asserted. For instance, in the example posed above, the nonminority teachers could easily demonstrate that the purpose and effect of the

plan is to impose a race-based classification. But when the Board introduces its statistical proof as evidence of its remedial purpose, thereby supplying the court with the means for determining that the Board had a firm basis for concluding that remedial action was appropriate, it is incumbent upon the nonminority teachers to prove their case; they continue to bear the ultimate burden of persuading the court that the Board's evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan instituted on the basis of this evidence was not sufficiently "narrowly tailored." Only by meeting this burden could the plaintiffs establish a violation of their constitutional rights, and thereby defeat the presumption that the Board's assertedly remedial action based on the statistical evidence was justified.

In sum, I do not think that the layoff provision was constitutionally infirm simply because the School Board, the Commission, or a court had not made particularized findings of discrimination at the time the provision was agreed upon. But when the plan was challenged, the District Court and the Court of Appeals did not make the proper inquiry into the legitimacy of the Board's asserted remedial purpose; instead, they relied upon governmental purposes that we have deemed insufficient to withstand strict scrutiny, and therefore failed to isolate a sufficiently important governmental purpose that could support the challenged provision.

There is, however, no need to inquire whether the provision actually had a legitimate remedial purpose based on the record, such as it is, because the judgment is vulnerable on yet another ground: the courts below applied a "reasonableness" test in evaluating the relationship between the ends pursued and the means employed to achieve them that is plainly incorrect under any of the standards articulated by this Court. Nor is it necessary, in my view, to resolve the troubling questions whether any layoff provision could survive strict scrutiny or whether this particular layoff provision

could, when considered without reference to the hiring goal it was intended to further, pass the onerous "narrowly tailored" requirement. Petitioners have met their burden of establishing that this layoff provision is not "narrowly tailored" to achieve its asserted remedial purpose by demonstrating that the provision is keyed to a hiring goal that itself has no relation to the remedying of employment discrimination.

Although the constitutionality of the hiring goal as such is not before us, it is impossible to evaluate the necessity of the layoff provision as a remedy for the apparent prior employment discrimination absent reference to that goal. See, e. g., post, at 306 (MARSHALL, J., dissenting). In this case, the hiring goal that the layoff provision was designed to safeguard was tied to the percentage of minority students in the school district, not to the percentage of qualified minority teachers within the relevant labor pool. The disparity between the percentage of minorities on the teaching staff and the percentage of minorities in the student body is not probative of employment discrimination; it is only when it is established that the availability of minorities in the relevant labor pool substantially exceeded those hired that one may draw an inference of deliberate discrimination in employment. See Hazelwood School District v. United States, 433 U. S. 299, 308 (1977) (Title VII context). Because the layoff provision here acts to maintain levels of minority hiring that have no relation to remedying employment discrimination, it cannot be adjudged "narrowly tailored" to effectuate its asserted remedial purpose.

I therefore join in Parts I, II, III, and V of the plurality's opinion, and concur in the judgment.

JUSTICE WHITE, concurring in the judgment.

The School Board's policy when layoffs are necessary is to maintain a certain proportion of minority teachers. This policy requires laying off nonminority teachers solely on the basis of their race, including teachers with seniority, and retaining other teachers solely because they are black, even

though some of them are in probationary status. None of the interests asserted by the Board, singly or together, justify this racially discriminatory layoff policy and save it from the strictures of the Equal Protection Clause. Whatever the legitimacy of hiring goals or quotas may be, the discharge of white teachers to make room for blacks, none of whom has been shown to be a victim of any racial discrimination, is quite a different matter. I cannot believe that in order to integrate a work force, it would be permissible to discharge whites and hire blacks until the latter comprised a suitable percentage of the work force. None of our cases suggest that this would be permissible under the Equal Protection Clause. Indeed, our cases look quite the other way. The layoff policy in this case—laying off whites who would otherwise be retained in order to keep blacks on the job—has the same effect and is equally violative of the Equal Protection Clause. I agree with the plurality that this official policy is unconstitutional and hence concur in the judgment.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE BLACKMUN join, dissenting.

When this Court seeks to resolve far-ranging constitutional issues, it must be especially careful to ground its analysis firmly in the facts of the particular controversy before it. Yet in this significant case, we are hindered by a record that is informal and incomplete. Both parties now appear to realize that the record is inadequate to inform the Court's decision. Both have lodged with the Court voluminous "submissions" containing factual material that was not considered by the District Court or the Court of Appeals. Petitioners have submitted 21 separate items, predominantly statistical charts, which they assert are relevant to their claim of discrimination. Respondents have submitted public documents that tend to substantiate the facts alleged in the brief accompanying their motion for summary judgment in the District Court. These include transcripts and exhibits from two prior proceedings, in which certain questions of dis-

crimination in the Jackson schools were litigated, *Jackson Education Assn.* v. *Board of Education*, No. 4–72340 (ED Mich. 1976) *(Jackson I)*, and *Jackson Education Assn.* v. *Board of Education*, No. 77–011484CZ (Jackson Cty. Cir. Ct. 1979) *(Jackson II)*.

We should not acquiesce in the parties' attempt to try their case before this Court. Yet it would be just as serious a mistake simply to ignore altogether, as the plurality has done, the compelling factual setting in which this case evidently has arisen. No race-conscious provision that purports to serve a remedial purpose can be fairly assessed in a vacuum.

The haste with which the District Court granted summary judgment to respondents, without seeking to develop the factual allegations contained in respondents' brief, prevented the full exploration of the facts that are now critical to resolution of the important issue before us. Respondents' acquiescence in a premature victory in the District Court should not now be used as an instrument of their defeat. Rather, the District Court should have the opportunity to develop a factual record adequate to resolve the serious issue raised by the case. I believe, therefore, that it is improper for this Court to resolve the constitutional issue in its current posture. But, because I feel that the plurality has also erred seriously in its legal analysis of the merits of this case, I write further to express my disagreement with the conclusions that it has reached.

I, too, believe that layoffs are unfair. But unfairness ought not be confused with constitutional injury. Paying no heed to the true circumstances of petitioners' plight, the plurality would nullify years of negotiation and compromise designed to solve serious educational problems in the public schools of Jackson, Michigan. Because I believe that a public employer, with the full agreement of its employees, should be permitted to preserve the benefits of a legitimate and constitutional affirmative-action hiring plan even while reducing its work force, I dissent.

## I

The record and extrarecord materials that we have before us persuasively suggest that the plurality has too quickly assumed the absence of a legitimate factual predicate, even under the plurality's own view, for affirmative action in the Jackson schools. The first black teacher in the Jackson public schools was hired in 1954.[1] In 1969, when minority representation on the faculty had risen only to 3.9%, the Jackson branch of the NAACP filed a complaint with the Michigan Civil Rights Commission, alleging that the Board had engaged in various discriminatory practices, including racial discrimination in the hiring of teachers. Respondents' Lodging No. 6 (complaint). The Commission conducted an investigation and concluded that each of the allegations had merit.[2]

In settlement of the complaint, the Commission issued an order of adjustment, under which the Jackson Board of Education (Board) agreed to numerous measures designed to improve educational opportunities for black public-school students. Among them was a promise to "[t]ake affirmative steps to recruit, hire and promote minority group teachers

[1] Unless otherwise indicated, the historical facts herein recited have been taken from the defendants' brief in support of its motion for summary judgment before the District Court, Record, Doc. No. 4, pp. 1–6.

[2] The Commission concluded: "Racial tension continues to be a part of the entire Jackson School System from the elementary level through high school. It would appear, therefore, that each of the allegations as stated in the complaint can be substantiated based upon organizational records, court files, school records, special committee reports and the appraisal conducted by the Superintendent of Schools." Respondents' Lodging No. 1–B, p. 11 (order of adjustment). This conclusion is supported by extrarecord materials suggesting that the shortage of minority teachers was the result of past discrimination in teacher hiring. For example, the then-Superintendent of Schools testified that "an administrator . . . told me she had tried to get a position in Jackson in the early 1950's and was told that they didn't hire colored people." This was the "type of thing," he stated, that led to adoption of Article XII. Respondents' Lodging No. 3, pp. 22–23.

and counselors as positions bec[a]me available . . . ." Respondents' Lodging No. 1–B, p. 3. As a result of the Board's efforts to comply with the order over the next two years, the percentage of minority teachers increased to 8.8%.

In 1971, however, faculty layoffs became necessary. The contract in effect at that time, between the Board and the Jackson Education Association (Union), provided that layoffs would be made in reverse order of seniority. Because of the recent vintage of the school system's efforts to hire minorities, the seniority scheme led to the layoff of a substantial number of minority teachers, "literally wip[ing] out all the gain" made toward achieving racial balance. Respondents' Lodging No. 3, p. 24 (deposition of Superintendent of Schools). Once again, minority teachers on the faculty were a rarity.

By early 1972, when racial tensions in the schools had escalated to violent levels, school officials determined that the best course was full integration of the school system, including integration of the faculty. But they recognized that, without some modification of the seniority layoff system, genuine faculty integration could not take place. See App. 41; Respondents' Lodging No. 3, p. 69 (deposition of Superintendent of Schools); Respondents' Lodging No. 2, pp. 16–20 (testimony of Union Executive Director, *Jackson I*). The Minority Affairs Office of the Jackson Public Schools submitted a questionnaire to all teachers, asking them to consider the possibility of abandoning the "last hired, first fired" approach to layoffs in favor of an absolute freeze on layoffs of minority teachers. The teachers overwhelmingly voted in favor of retaining the straight seniority system. Negotiations ensued between the two camps — on the one hand, the Board, which favored a freeze of minority layoffs and, on the other, the Union, urging straight seniority—and the negotiators ultimately reached accord. One Union leader characterized the development of the layoff compromise as the most

difficult balancing of equities that he had ever encountered. Record, Doc. No. 4, p. 5.

The compromise avoided placing the entire burden of layoffs on either the white teachers as a group or the minority teachers as a group. Instead, each group would shoulder a portion of that burden equal to its portion of the faculty. Thus, the overall percentage of minorities on the faculty would remain constant. Within each group, seniority would govern which individuals would be laid off. This compromise was the provision at issue here, subsequently known as Article XII:

> "In the event that it becomes necessary to reduce the number of teachers through layoff from employment by the Board, teachers with the most seniority in the district shall be retained, except that at no time will there be a greater percentage of minority personnel laid off than the current percentage of minority personnel employed at the time of the layoff. . . . Each teacher so affected will be called back in reverse order for positions for which he is certified maintaining the above minority balance." App. 13.

The Board and the Union leadership agreed to the adoption of Article XII. The compromise was then presented to the teachers, who ratified it by majority vote. Each of the six times that the contract has been renegotiated, Article XII has been presented for reconsideration to the members of the Union, at least 80% of whom are white, and each time it has been ratified.

To petitioners, at the bottom of the seniority scale among white teachers, fell the lot of bearing the white group's proportionate share of layoffs that became necessary in 1982. Claiming a right not to lose their jobs ahead of minority teachers with less seniority, petitioners brought this challenge to Article XII under the Equal Protection Clause of the Fourteenth Amendment.

## II

From the outset, it is useful to bear in mind what this case is not. There has been no court order to achieve racial balance, which might require us to reflect upon the existence of judicial power to impose obligations on parties not proved to have committed a wrong. See *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 16 (1971). There is also no occasion here to resolve whether a white worker may be required to give up his or her job in order to be replaced by a black worker. See *Steelworkers* v. *Weber*, 443 U. S. 193, 208 (1979). Nor are we asked to order parties to suffer the consequences of an agreement that they had no role in adopting. See *Firefighters* v. *Stotts*, 467 U. S. 561, 575 (1984). Moreover, this is not a case in which a party to a collective-bargaining agreement has attempted unilaterally to achieve racial balance by refusing to comply with a contractual, seniority-based layoff provision. Cf. *Teamsters* v. *United States*, 431 U. S. 324, 350, 352 (1977).

The sole question posed by this case is whether the Constitution prohibits a union and a local school board from developing a collective-bargaining agreement that apportions layoffs between two racially determined groups as a means of preserving the effects of an affirmative hiring policy, the constitutionality of which is unchallenged.[3]

---

[3] JUSTICE O'CONNOR rests her disposition of this case on the propriety of the hiring plan, even though petitioners have not challenged it. She appears to rely on language in the preamble to the collective-bargaining agreement, which suggests that the "goal of such [affirmative-action] policy shall be to have at least the same percentage of minority racial representation on each individual staff as is represented by the student population of the Jackson Public Schools." Article VII.D.1, App. to Pet. for Cert. 1a. Believing that the school system's hiring "goal" ought instead to be the percentage of qualified minorities in the labor pool, JUSTICE O'CONNOR concludes that the challenged layoff provision itself is overly broad. *Ante*, at 294. Among the materials considered by the District Court and Court of Appeals, however, there is no evidence to show the actual proportion of minority teachers in the Jackson schools, either in relation to

## III

Agreement upon a means for applying the Equal Protection Clause to an affirmative-action program has eluded this Court every time the issue has come before us.   In *University of California Regents* v. *Bakke*, 438 U. S. 265 (1978), four Members of the Court concluded that, while racial distinctions are irrelevant to nearly all legitimate state objectives and are properly subjected to the most rigorous judicial scrutiny in most instances, they are highly relevant to the one legitimate state objective of eliminating the pernicious vestiges of past discrimination; when that is the goal, a less exacting standard of review is appropriate.   We explained at length our view that, because no fundamental right was involved and because whites have none of the immutable characteristics of a suspect class, the so-called "strict scrutiny" applied to cases involving either fundamental rights or suspect classifications was not applicable.   *Id.*, at 357 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.). Nevertheless, we eschewed the least rigorous, "rational basis" standard of review, recognizing that any racial classification is subject to misuse.   We determined that remedial use of race is permissible if it serves "important govern-

the qualified minority labor force or in relation to the number of minority students.   If the distinction between the two goals is to be considered critical to the constitutionality of the affirmative-action plan, it is incumbent on petitioners—plaintiffs below—to demonstrate that, at the time they were laid off, the proportion of minority teachers had equaled or exceeded the appropriate percentage of the minority labor force, and that continued adherence to affirmative-action goals, therefore, unjustifiably caused their injuries.   This petitioners have failed to do.   Outside of the First Amendment context, I know of no justification for invalidating a provision because it might, in a hypothetical case, apply improperly to other potential plaintiffs.   Petitioners have attempted to fill the gap in their case by supplying statistical charts to this Court.   See, *e. g.*, Petitioners' Lodging, pp. 56–62.   Clearly, however, we are not equipped for such factfinding, and if the hortatory ceiling of the affirmative-action plan is indeed to be considered a significant aspect of the case, then that would be an appropriate subject of inquiry on remand.

mental objectives" and is "substantially related to achievement of those objectives." *Id.*, at 359; see also *id.*, at 387 (opinion of MARSHALL, J.); *id.*, at 402 (opinion of BLACKMUN, J.). This standard is genuinely a "strict and searching" judicial inquiry, but is "not '"strict" in theory and fatal in fact.'" *Id.*, at 362 (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.) (quoting Gunther, The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1, 8 (1972)). The only other Justice to reach the constitutional issue in *Bakke* suggested that, remedial purpose or no, any racial distinctions "call for the most exacting judicial examination." *Id.*, at 291 (opinion of POWELL, J.).

In *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980), the Court again disagreed as to the proper standard of review. Three Justices, of whom I was one, concluded that a statute reserving 10% of federal funds for minority contractors served important governmental objectives and was substantially related to achievement of those objectives, surviving attack under our *Bakke* test. 448 U. S., at 519 (MARSHALL, J., joined by BRENNAN and BLACKMUN, JJ., concurring in judgment). Three other Justices expressly declined to adopt any standard of review, deciding that the provision survived judicial scrutiny under either of the formulae articulated in *Bakke*. 448 U. S., at 492 (opinion of BURGER, C. J., joined by WHITE and POWELL, JJ.).

Despite the Court's inability to agree on a route, we have reached a common destination in sustaining affirmative action against constitutional attack. In *Bakke,* we determined that a state institution may take race into account as a factor in its decisions, 438 U. S., at 326, and in *Fullilove*, the Court upheld a congressional preference for minority contractors because the measure was legitimately designed to ameliorate the present effects of past discrimination, 448 U. S., at 520.

In this case, it should not matter which test the Court applies. What is most important, under any approach to the constitutional analysis, is that a reviewing court genuinely consider the circumstances of the provision at issue. The history and application of Article XII, assuming verification upon a proper record, demonstrate that this provision would pass constitutional muster, no matter which standard the Court should adopt.

## IV

The principal state purpose supporting Article XII is the need to preserve the levels of faculty integration achieved through the affirmative hiring policy adopted in the early 1970's. Brief for Respondents 41–43. Justification for the hiring policy itself is found in the turbulent history of the effort to integrate the Jackson public schools—not even mentioned in the plurality opinion—which attests to the bona fides of the Board's current employment practices.

The record and lodgings indicate that the Commission, endowed by the State Constitution with the power to investigate complaints of discrimination and the duty to secure the equal protection of the laws, Mich. Const., Art. V, § 29, prompted and oversaw the remedial steps now under attack.[4] When the Board agreed to take specified remedial action, including the hiring and promotion of minority teachers, the Commission did not pursue its investigation of the apparent violations to the point of rendering formal findings of discrimination.

---

[4] The Commission currently describes its participation in the Jackson matter as follows: "[T]he Commission investigated the allegations and sought *to remedy the apparent violations* by negotiating an order of adjustment with the Jackson Board. . . . [T]he out-of-line seniority layoff provisions in the Jackson Board of Education's employment contracts with its teachers since 1972 are consistent with overall desegregation efforts undertaken *in compliance with* the Commission's order of adjustment." Brief for Michigan Civil Rights Commission, Michigan Dept. of Civil Rights as *Amicus Curiae* 14 (emphasis added).

Instead of subjecting an already volatile school system to the further disruption of formal accusations and trials, it appears that the Board set about achieving the goals articulated in the settlement. According to the then-Superintendent of Schools, the Board was aware, at every step of the way, that "[t]he NAACP had its court suit ready if either the Board postponed the [integration] operation or abandoned the attempts. They were willing to—they were ready to go into Federal court and get a court order, as happened in Kalamazoo." Respondents' Lodging No. 3, p. 44. Rather than provoke the looming lawsuit, the Board and the Union worked with the committees to reach a solution to the racial problems plaguing the school system. In 1972, the Board explained to parents why it had adopted a voluntary integration plan:

> "Waiting for what appears the inevitable only flames passions and contributes to the difficulties of an orderly transition from a segregated to a desegregated school system. Firmly established legal precedents mandate a change. Many citizens know this to be true.
>
> "Waiting for a court order emphasizes to many that we are quite willing to disobey the law until the court orders us not to disobey the law. . . . Further, court orders cost money for both the school system and the litigants." Respondents' Lodging No. 1, pp. 1–2 (Exhibit No. 8, *Jackson I*).

An explicit Board admission or judicial determination of culpability, which petitioners and even the Solicitor General urge us to hold was required before the Board could undertake a race-conscious remedial plan, see Brief for Petitioners 27–29; Brief for United States as *Amicus Curiae* 29, would only have exposed the Board in this case to further litigation and liability, including individual liability under 42 U. S. C. § 1983, for past acts. It would have contributed nothing to the advancement of the community's urgent objective of integrating its schools.

The real irony of the argument urging mandatory, formal findings of discrimination lies in its complete disregard for a longstanding goal of civil rights reform, that of integrating schools without taking every school system to court. Our school desegregation cases imposed an affirmative duty on local school boards to see that "racial discrimination would be eliminated root and branch." *Green* v. *New Kent County School Board,* 391 U. S. 430, 437–438 (1968); see *Brown* v. *Board of Education,* 349 U. S. 294, 299 (1955). Petitioners would now have us inform the Board, having belatedly taken this Court's admonitions to heart, that it should have delayed further, disputing its obligations and forcing the aggrieved parties to seek judicial relief. This result would be wholly inconsistent with the national policies against overloading judicial dockets, maintaining groundless defenses, and impeding good-faith settlement of legal disputes. Only last Term, writing for the Court, THE CHIEF JUSTICE reaffirmed that civil rights litigation is no exception to the general policy in favor of settlements: "Indeed, Congress made clear its concern that civil rights plaintiffs not be penalized for 'helping to lessen docket congestion' by settling their cases out of court. . . . In short, settlements rather than litigation will serve the interests of plaintiffs as well as defendants." *Marek* v. *Chesny,* 473 U. S. 1, 10 (1985). It would defy equity to penalize those who achieve harmony from discord, as it would defy wisdom to impose on society the needless cost of superfluous litigation. The Court is correct to recognize, as it does at least implicitly today, that formal findings of past discrimination are not a necessary predicate to the adoption of affirmative-action policies, and that the scope of such policies need not be limited to remedying specific instances of identifiable discrimination. See *ante,* at 277 (opinion of POWELL, J.); *ante,* at 289–291 (opinion of O'CONNOR, J.).

Moreover, under the apparent circumstances of this case, we need not rely on any general awareness of "societal discrimination" to conclude that the Board's purpose is of suf-

ficient importance to justify its limited remedial efforts. There are allegations that the imperative to integrate the public schools was urgent. Racially motivated violence had erupted at the schools, interfering with all educational objectives. We are told that, having found apparent violations of the law and a substantial underrepresentation of minority teachers, the state agency responsible for ensuring equality of treatment for all citizens of Michigan had instituted a settlement that required the Board to adopt affirmative hiring practices in lieu of further enforcement proceedings. That agency, participating as *amicus curiae* through the Attorney General of Michigan, still stands fully behind the solution that the Board and the Union adopted in Article XII, viewing it as a measure necessary to attainment of stability and educational quality in the public schools. See n. 4, *supra*. Surely, if properly presented to the District Court, this would supply the "[e]videntiary support for the conclusion that remedial action is warranted" that the plurality purports to seek, *ante*, at 277. Since the District Court did not permit submission of this evidentiary support, I am at a loss as to why JUSTICE POWELL so glibly rejects the obvious solution of remanding for the factfinding he appears to recognize is necessary. See *ante*, at 278–279, n. 5.

Were I satisfied with the record before us, I would hold that the state purpose of preserving the integrity of a valid hiring policy—which in turn sought to achieve diversity and stability for the benefit of *all* students—was sufficient, in this case, to satisfy the demands of the Constitution.

## V

The second part of any constitutional assessment of the disputed plan requires us to examine the means chosen to achieve the state purpose. Again, the history of Article XII, insofar as we can determine it, is the best source of assistance.

## A

Testimony of both Union and school officials illustrates that the Board's obligation to integrate its faculty could not have been fulfilled meaningfully as long as layoffs continued to eliminate the last hired. See App. 41; Respondents' Lodging No. 3, p. 69 (deposition of Superintendent of Schools); Respondents' Lodging No. 2, pp. 16–20 (testimony of Union Executive Director, *Jackson I*). In addition, qualified minority teachers from other States were reluctant to uproot their lives and move to Michigan without any promise of protection from imminent layoff. The testimony suggests that the lack of some layoff protection would have crippled the efforts to recruit minority applicants. *Id.*, at 20, 55, 56. Adjustment of the layoff hierarchy under these circumstances was a necessary corollary of an affirmative hiring policy.

## B

Under JUSTICE POWELL's approach, the community of Jackson, having painfully watched the hard-won benefits of its integration efforts vanish as a result of massive layoffs, would be informed today, simply, that preferential layoff protection is never permissible because hiring policies serve the same purpose at a lesser cost. See *ante*, at 283–284. As a matter of logic as well as fact, a hiring policy achieves no purpose at all if it is eviscerated by layoffs. JUSTICE POWELL's position is untenable.

JUSTICE POWELL has concluded, by focusing exclusively on the undisputed hardship of losing a job, that the Equal Protection Clause always bars race-conscious layoff plans. This analysis overlooks, however, the important fact that Article XII does not cause the loss of jobs; someone will lose a job under any layoff plan and, whoever it is, that person will not deserve it. Any *per se* prohibition against layoff protection, therefore, must rest upon a premise that the tradition of basing layoff decisions on seniority is so fundamental that its

modification can never be permitted. Our cases belie that premise.

The general practice of basing employment decisions on relative seniority may be upset for the sake of other public policies. For example, a court may displace innocent workers by granting retroactive seniority to victims of employment discrimination. *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 775 (1976). Further, this Court has long held that "employee expectations arising from a seniority system agreement may be modified by statutes furthering a strong public policy interest." *Id.*, at 778. And we have recognized that collective-bargaining agreements may go further than statutes in enhancing the seniority of certain employees for the purpose of fostering legitimate interests. See *Ford Motor Co.* v. *Huffman*, 345 U. S. 330, 339–340 (1953). Accordingly, we have upheld one collectively bargained provision that bestowed enhanced seniority on those who had served in the military before employment, *id.*, at 340, and another that gave preferred seniority status to union chairmen, to the detriment of veterans. *Aeronautical Industrial District Lodge 727* v. *Campbell*, 337 U. S. 521, 529 (1949).

In *Steelworkers* v. *Weber*, 443 U. S. 193 (1979), we specifically addressed a departure from the seniority principle designed to alleviate racial disparity. In *Weber*, a private employer and a union negotiated a collective agreement that reserved for black employees one half of all openings in a plant training program, replacing the prior system of awarding all seats on the basis of seniority. This plan tampered with the expectations attendant to seniority, and redistributed opportunities to achieve an important qualification toward advancement in the company. We upheld the challenged plan under the Civil Rights Act of 1964 because it was designed to "eliminate traditional patterns of racial segregation" in the industry and did not "unnecessarily trammel the interests of the white employees." *Id.*, at 201, 208. We required no judicial finding or employer admission of past dis-

crimination to justify that interference with the seniority hierarchy for the sake of the legitimate purposes at stake.

These cases establish that protection from layoff is not altogether unavailable as a tool for achieving legitimate societal goals. It remains to be determined whether the particular form of layoff protection embodied in Article XII falls among the permissible means for preserving minority proportions on the teaching staff.

## C

Article XII is a narrow provision because it allocates the impact of an unavoidable burden proportionately between two racial groups. It places no absolute burden or benefit on one race, and, within the confines of constant minority proportions, it preserves the hierarchy of seniority in the selection of individuals for layoff. Race is a factor, along with seniority, in determining which individuals the school system will lose; it is not alone dispositive of any individual's fate. Cf. *Bakke*, 438 U. S., at 318 (opinion of POWELL, J.). Moreover, Article XII does not use layoff protection as a tool for *increasing* minority representation; achievement of that goal is entrusted to the less severe hiring policies.[5] And Article XII is narrow in the temporal sense as well. The very bilateral process that gave rise to Article XII when its adoption was necessary will also occasion its demise when remedial measures are no longer required. Finally, Article XII modifies contractual expectations that do not themselves carry any connotation of merit or achievement; it does not interfere with the "cherished American ethic" of "[f]airness in individual competition," *Bakke, supra*, at 319, n. 53, depriving indi-

---

[5] JUSTICE WHITE assumes that respondents' plan is equivalent to one that deliberately seeks to change the racial composition of a staff by firing and hiring members of predetermined races. *Ante*, at 295. That assumption utterly ignores the fact that the Jackson plan involves only the means for selecting the employees who will be chosen for layoffs already necessitated by external economic conditions. This plan does not seek to supplant whites with blacks, nor does it contribute in any way to the number of job losses.

viduals of an opportunity that they could be said to deserve. In all of these important ways, Article XII metes out the hardship of layoffs in a manner that achieves its purpose with the smallest possible deviation from established norms.

The Board's goal of preserving minority proportions could have been achieved, perhaps, in a different way. For example, if layoffs had been determined by lottery, the ultimate effect would have been retention of current racial percentages. A random system, however, would place every teacher in equal jeopardy, working a much greater upheaval of the seniority hierarchy than that occasioned by Article XII; it is not at all a less restrictive means of achieving the Board's goal. Another possible approach would have been a freeze on layoffs of minority teachers. This measure, too, would have been substantially more burdensome than Article XII, not only by necessitating the layoff of a greater number of white teachers, but also by erecting an absolute distinction between the races, one to be benefited and one to be burdened, in a way that Article XII avoids. Indeed, neither petitioners nor any Justice of this Court has suggested an alternative to Article XII that would have attained the stated goal in any narrower or more equitable a fashion. Nor can I conceive of one.

## VI

It is no accident that this least burdensome of all conceivable options is the very provision that the parties adopted. For Article XII was forged in the crucible of clashing interests. All of the economic powers of the predominantly white teachers' union were brought to bear against those of the elected Board, and the process yielded consensus.

The concerns that have prompted some Members of this Court to call for narrowly tailored, perhaps court-ordered, means of achieving racial balance spring from a legitimate fear that racial distinctions will again be used as a means to persecute individuals, while couched in benign phraseology. That fear has given rise to mistrust of those who profess to

take remedial action, and concern that any such action "work the least harm possible to other innocent persons competing for the benefit." *Bakke, supra,* at 308 (opinion of POWELL, J.). One Justice has warned that "if innocent employees are to be made to make any sacrifices . . . , they must be represented and have had full participation rights in the negotiation process," *Firefighters* v. *Stotts,* 467 U. S., at 588, n. 3 (O'CONNOR, J., concurring), and another has called for a "principle for deciding whether preferential classifications reflect a benign remedial purpose or a malevolent stigmatic classification . . . ." *Bakke, supra,* at 294–295, n. 34 (opinion of POWELL, J.). This case answers that call.

The collective-bargaining process is a legitimate and powerful vehicle for the resolution of thorny problems, and we have favored "minimal supervision by courts and other governmental agencies over the substantive terms of collective-bargaining agreements." *American Tobacco Co.* v. *Patterson,* 456 U. S. 63, 76–77 (1982). We have also noted that "[s]ignificant freedom must be afforded employers and unions to create differing seniority systems," *California Brewers Assn.* v. *Bryant,* 444 U. S. 598, 608 (1980).[6] The perceived dangers of affirmative action misused, therefore, are naturally averted by the bilateral process of negotiation, agreement, and ratification. The best evidence that Article XII is a narrow means to serve important interests is that representatives of all affected persons, starting from diametrically opposed perspectives, have agreed to it—not once, but six times since 1972.

## VII

The narrow question presented by this case, if indeed we proceed to the merits, offers no occasion for the Court to issue broad proclamations of public policy concerning the

---

[6] This deference is warranted only if the union represents the interests of the workers fairly; a union's breach of that duty in the form of racial discrimination gives rise to an action by the worker against the union. See *Steele* v. *Louisville & Nashville R. Co.,* 323 U. S. 192, 207 (1944).

controversial issue of affirmative action. Rather, this case calls for calm, dispassionate reflection upon exactly what has been done, to whom, and why. If one honestly confronts each of those questions against the factual background suggested by the materials submitted to us, I believe the conclusion is inescapable that Article XII meets, and indeed surpasses, any standard for ensuring that race-conscious programs are necessary to achieve remedial purposes. When an elected school board and a teachers' union collectively bargain a layoff provision designed to preserve the effects of a valid minority recruitment plan by apportioning layoffs between two racial groups, as a result of a settlement achieved under the auspices of a supervisory state agency charged with protecting the civil rights of all citizens, that provision should not be upset by this Court on constitutional grounds.

The alleged facts that I have set forth above evince, at the very least, a wealth of plausible evidence supporting the Board's position that Article XII was a legitimate and necessary response both to racial discrimination and to educational imperatives. To attempt to resolve the constitutional issue either with no historical context whatever, as the plurality has done, or on the basis of a record devoid of established facts, is to do a grave injustice not only to the Board and teachers of Jackson and to the State of Michigan, but also to individuals and governments committed to the goal of eliminating all traces of segregation throughout the country. Most of all, it does an injustice to the aspirations embodied in the Fourteenth Amendment itself. I would vacate the judgment of the Court of Appeals and remand with instructions that the case be remanded to the District Court for further proceedings consistent with the views I have expressed.[7]

---

[7] I do not envy the District Court its task of sorting out what this Court has and has not held today. It is clear, at any rate, that from among the many views expressed today, two noteworthy results emerge: a majority of the Court has explicitly rejected the argument that an affirmative-action plan must be preceded by a formal finding that the entity seeking to insti-

JUSTICE STEVENS, dissenting.

In my opinion, it is not necessary to find that the Board of Education has been guilty of racial discrimination in the past to support the conclusion that it has a legitimate interest in employing more black teachers in the future. Rather than analyzing a case of this kind by asking whether minority teachers have some sort of special entitlement to jobs as a remedy for sins that were committed in the past, I believe that we should first ask whether the Board's action advances the public interest in educating children for the future. If so, I believe we should consider whether that public interest, and the manner in which it is pursued, justifies any adverse effects on the disadvantaged group.[1]

I

The Equal Protection Clause absolutely prohibits the use of race in many governmental contexts. To cite only a few: the government may not use race to decide who may serve on juries,[2] who may use public services,[3] who may marry,[4] and who may be fit parents.[5] The use of race in these situations is "utterly irrational" because it is completely unrelated

---

tute the plan has committed discriminatory acts in the past; and the Court has left open whether layoffs may be used as an instrument of remedial action.

[1] "In every equal protection case, we have to ask certain basic questions. What class is harmed by the legislation, and has it been subjected to a 'tradition of disfavor' by our laws? What is the public purpose that is being served by the law? What is the characteristic of the disadvantaged class that justifies the disparate treatment?" *Cleburne* v. *Cleburne Living Center*, 473 U. S. 432, 453 (1985) (STEVENS, J., concurring).

[2] *Batson* v. *Kentucky, ante*, p. 79; *Vasquez* v. *Hillery*, 474 U. S. 254 (1985); *Rose* v. *Mitchell*, 443 U. S. 545 (1979); *Strauder* v. *West Virginia*, 100 U. S. 303 (1880).

[3] *Turner* v. *City of Memphis*, 369 U. S. 350 (1962) *(per curiam); Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961).

[4] *Loving* v. *Virginia*, 388 U. S. 1 (1967).

[5] *Palmore* v. *Sidoti*, 466 U. S. 429 (1984).

to any valid public purpose;[6] moreover, it is particularly pernicious because it constitutes a badge of oppression that is unfaithful to the central promise of the Fourteenth Amendment.

Nevertheless, in our present society, race is not always irrelevant to sound governmental decisionmaking.[7] To take the most obvious example, in law enforcement, if an under-cover agent is needed to infiltrate a group suspected of on-going criminal behavior—and if the members of the group are all of the same race—it would seem perfectly rational to employ an agent of that race rather than a member of a differ-ent racial class. Similarly, in a city with a recent history of racial unrest, the superintendent of police might reasonably conclude that an integrated police force could develop a better relationship with the community and thereby do a more effec-tive job of maintaining law and order than a force composed only of white officers.

---

[6] *Cleburne*, 473 U. S., at 452 (STEVENS, J., concurring in judgment) ("It would be utterly irrational to limit the franchise on the basis of height or weight; it is equally invalid to limit it on the basis of skin color"). See also *Palmore* v. *Sidoti*, 466 U. S., at 432 ("Classifying persons according to their race is more likely to reflect racial prejudice than legitimate public concerns; the race, not the person, dictates the category").

[7] As JUSTICE MARSHALL explains, although the Court's path in *University of California Regents* v. *Bakke*, 438 U. S. 265 (1978), and *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980), is tortuous, the path at least reveals that race consciousness does not automatically violate the Equal Protection Clause. In those opinions, only two Justices of the Court suggested that race-conscious governmental efforts were inherently unconstitutional. See *id.*, at 522 (Stewart, J., dissenting, joined by REHNQUIST, J.). Cf. *id.*, at 548 (STEVENS, J., dissenting) ("Unlike Mr. Justice Stewart and MR. JUSTICE REHNQUIST, . . . I am not convinced that the Clause contains an absolute prohibition against any statutory classification based on race"). Notably, in this Court, petitioners have presented solely a constitutional theory, and have not pursued any statutory claims. Cf. *Bakke*, 438 U. S. at 408 (STEVENS, J., concurring in judgment in part and dissenting in part) (suggesting that constitutional issue need not be reached because statutory issue was dispositive).

In the context of public education,[8] it is quite obvious that a school board may reasonably conclude that an integrated faculty will be able to provide benefits to the student body that could not be provided by an all-white, or nearly all-white, faculty. For one of the most important lessons that the American public schools teach is that the diverse ethnic, cultural, and national backgrounds that have been brought together in our famous "melting pot" do not identify essential differences among the human beings that inhabit our land. It is one thing for a white child to be taught by a white teacher that color, like beauty, is only "skin deep"; it is far more convincing to experience that truth on a day-to-day basis during the routine, ongoing learning process.

In this case, the collective-bargaining agreement between the Union and the Board of Education succinctly stated a valid public purpose—"recognition of the desirability of multi-ethnic representation on the teaching faculty," and thus "a policy of actively seeking minority group personnel." App. to Pet. for Cert. 22a. Nothing in the record—not a shred of evidence—contradicts the view that the Board's attempt to employ, and to retain, more minority teachers in the Jackson public school system served this completely sound educational purpose. Thus, there was a rational and unques-

---

[8] The Court has frequently emphasized the role of public schools in our national life. See *Board of Education* v. *Pico,* 457 U. S. 853, 864 (1982) (plurality opinion) ("[P]ublic schools are vitally important . . . as vehicles for 'inculcating fundamental values necessary to the maintenance of a democratic political system'"); *Ambach* v. *Norwick,* 441 U. S. 68, 76 (1979) ("The importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests, long has been recognized by our decisions"); *San Antonio Independent School District* v. *Rodriguez,* 411 U. S. 1, 30 (1973) ("'[T]he grave significance of education both to the individual and to our society' cannot be doubted"); *Brown* v. *Board of Education,* 347 U. S. 483, 493 (1954) ("[E]ducation . . . is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment").

tionably legitimate basis for the Board's decision to enter into the collective-bargaining agreement that petitioners have challenged, even though the agreement required special efforts to recruit and retain minority teachers.

## II

It is argued, nonetheless, that the purpose should be deemed invalid because, even if the Board of Education's judgment in this case furthered a laudable goal, some other boards might claim that their experience demonstrates that segregated classes, or segregated faculties, lead to better academic achievement. There is, however, a critical difference between a decision to *exclude* a member of a minority race because of his or her skin color and a decision to *include* more members of the minority in a school faculty for that reason.

The exclusionary decision rests on the false premise that differences in race, or in the color of a person's skin, reflect real differences that are relevant to a person's right to share in the blessings of a free society. As noted, that premise is "utterly irrational," *Cleburne* v. *Cleburne Living Center*, 473 U. S. 432, 452 (1985), and repugnant to the principles of a free and democratic society. Nevertheless, the fact that persons of different races do, indeed, have differently colored skin, may give rise to a belief that there is some significant difference between such persons. The inclusion of minority teachers in the educational process inevitably tends to dispel that illusion whereas their exclusion could only tend to foster it. The inclusionary decision is consistent with the principle that all men are created equal; the exclusionary decision is at war with that principle. One decision accords with the Equal Protection Clause of the Fourteenth Amendment; the other does not. Thus, consideration of whether the consciousness of race is exclusionary or inclusionary plainly distinguishes the Board's valid purpose in this case from

a race-conscious decision that would reinforce assumptions of inequality.[9]

### III

Even if there is a valid purpose to the race consciousness, however, the question that remains is whether that public purpose transcends the harm to the white teachers who are disadvantaged by the special preference the Board has given to its most recently hired minority teachers. In my view, there are two important inquiries in assessing the harm to the disadvantaged teacher. The first is an assessment of the procedures that were used to adopt, and implement, the race-conscious action.[10] The second is an evaluation of the nature of the harm itself.

In this case, there can be no question about either the fairness of the procedures used to adopt the race-conscious pro-

---

[9] Cf. *Palmore* v. *Sidoti*, 466 U. S., at 434 ("The effects of racial prejudice, however real, cannot justify a racial classification removing an infant child from the custody of its natural mother found to be an appropriate person to have such custody"); *Buchanan* v. *Warley*, 245 U. S. 60, 81 (1917) (rejecting legitimacy of argument that the "proposed segregation will promote the public peace by preventing race conflicts").

[10] Cf. *Fullilove*, 448 U. S., at 548–549 (STEVENS, J., dissenting) (A race-based classification "does impose a special obligation to scrutinize any governmental decisionmaking process that draws nationwide distinctions between citizens on the basis of their race and incidentally also discriminates against noncitizens in the preferred racial classes. For just as procedural safeguards are necessary to guarantee impartial decisionmaking in the judicial process, so can they play a vital part in preserving the impartial character of the legislative process"). That observation is, of course, equally applicable to a context in which the governmental decision is reached through a nonlegislative process. Significantly, a reason given for what this Court frequently calls "strict scrutiny" of certain classifications is the notion that the disadvantaged class is one that has been unable to enjoy full procedural participation. See *United States* v. *Carolene Products, Co.*, 304 U. S. 144, 152–153, n. 4 (1938) ("[P]rejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry"); J. Ely, Democracy and Distrust 75–77 (1980).

vision, or the propriety of its breadth. As JUSTICE MAR-
SHALL has demonstrated, the procedures for adopting this
provision were scrupulously fair. The Union that represents
petitioners negotiated the provision and agreed to it; the
agreement was put to a vote of the membership, and over-
whelmingly approved. Again, not a shred of evidence in the
record suggests *any* procedural unfairness in the adoption of
the agreement. Similarly, the provision is specifically de-
signed to achieve its objective—retaining the minority teach-
ers that have been specially recruited to give the Jackson
schools, after a period of racial unrest, an integrated faculty.[11]
Thus, in striking contrast to the procedural inadequacy and
unjustified breadth of the race-based classification in *Fulli-
love* v. *Klutznick,* 448 U. S. 448 (1980),[12] the race-conscious
layoff policy here was adopted with full participation of the
disadvantaged individuals and with a narrowly circumscribed
berth for the policy's operation.

Finally, we must consider the harm to petitioners. Every
layoff, like every refusal to employ a qualified applicant,
is a grave loss to the affected individual. However, the
undisputed facts in this case demonstrate that this serious
consequence to petitioners is not based on any lack of
respect for their race, or on blind habit and stereotype.[13]
Rather, petitioners have been laid off for a combination of

---

[11] The layoff provision states:

"In the event that it becomes necessary to reduce the number of teachers
through layoff from employment by the Board, teachers with the most se-
niority in the district shall be retained, except that at no time will there be
a greater percentage of minority personnel laid off than the current per-
centage of minority personnel employed at the time of the layoff." App. to
Pet. for Cert. 23a.

The layoff provision follows the agreement's statement of the goal of an in-
creased minority presence on the faculty and of the commitment to active
minority recruiting and hiring efforts. *Id.,* at 22a–23a.

[12] See 448 U. S., at 532 (STEVENS, J., dissenting).

[13] Cf. *Mathews* v. *Lucas,* 427 U. S. 495, 520–521 (1976) (STEVENS, J.,
dissenting).

two reasons: the economic conditions that have led Jackson to lay off some teachers, and the special contractual protections intended to preserve the newly integrated character of the faculty in the Jackson schools. Thus, the same harm might occur if a number of gifted young teachers had been given special contractual protection because their specialties were in short supply and if the Jackson Board of Education faced a fiscal need for layoffs. A Board decision to grant immediate tenure to a group of experts in computer technology, an athletic coach, and a language teacher, for example, might reduce the pool of teachers eligible for layoffs during a depression and therefore have precisely the same impact as the racial preference at issue here. In either case, the harm would be generated by the combination of economic conditions and the special contractual protection given a different group of teachers — a protection that, as discussed above, was justified by a valid and extremely strong public interest.[14]

## IV

We should not lightly approve the government's use of a race-based distinction. History teaches the obvious dangers

---

[14] The fact that the issue arises in a layoff context, rather than a hiring context, has no bearing on the equal protection question. For if the Board's interest in employing more minority teachers is sufficient to justify providing them with an extra incentive to accept jobs in Jackson, Michigan, it is also sufficient to justify their retention when the number of available jobs is reduced. JUSTICE POWELL's suggestion, *ante,* at 282–284, that there is a distinction of constitutional significance under the Equal Protection Clause between a racial preference at the time of hiring and an identical preference at the time of discharge is thus wholly unpersuasive. He seems to assume that a teacher who has been working for a few years suffers a greater harm when he is laid off than the harm suffered by an unemployed teacher who is refused a job for which he is qualified. In either event, the adverse decision forecloses "only one of several opportunities" that may be available, *ante,* at 283, to the disappointed teacher. Moreover, the distinction is artificial, for the layoff provision at issue in this case was included as part of the terms of the *hiring* of minority and other teachers under the collective-bargaining agreement.

of such classifications.[15]   Our ultimate goal must, of course, be "to eliminate entirely from governmental decisionmaking such irrelevant factors as a human being's race."[16]   In this case, however, I am persuaded that the decision to include more minority teachers in the Jackson, Michigan, school system served a valid public purpose, that it was adopted with fair procedures and given a narrow breadth, that it transcends the harm to petitioners, and that it is a step toward that ultimate goal of eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race.   I would therefore affirm the judgment of the Court of Appeals.

---

[15] See, *e. g.*, *Fullilove*, 448 U. S., at 534, n. 5 (STEVENS, J., dissenting).
[16] *Id.*, at 547.