Richard F. CONLIN, Plaintiff,

Richard L. Fitzpatrick, et al.,
Plaintiffs–Appellants,

v.

James J. BLANCHARD, et al.,
Defendants–Appellees.

No. 88–1982.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 3, 1989.

Decided Nov. 27, 1989.

Charles J. Porter (argued), Hardig & McConnell, Bloomfield Hills, Mich., for Richard F. Conlin and Richard L. Fitzpatrick, Roger A. Ruppal, and Richard J. Victorson.

Deborah A. Devine, Asst. Atty. Gen. (argued), Lansing, Mich., for James J. Blanchard, Martha W. Griffiths, Frank J. Kelley, John R. Castillo, John F. Hueni, Robert H. Naftaly, Doug Ross, Elizabeth P. Howe, James P. Pitz, and C. Patrick Babcock.

Noel A. Gage, Scott D. Moore, Gage, Herzfeld & Rubin, Southfield, Mich., for John F. Dodge, Walter R. Greene, Patricia B. Johnson, and Alan A. May.

Dianne M. Rubin, Asst. Atty. Gen., Office of the Attorney General, Detroit, Mich., for Dorothy Haener, Benny Napoleon, Beberly Clark, Sondra L. Berlin, Eva Evans, Michael C. Hidalgo, and William Holly.

Merry A. Rosenberg, Office of the Attorney General of Michigan, Lansing, Mich., for Robert A. Bowman, and James A. Pitz.

Before NELSON and BOGGS, Circuit Judges; and WILHOIT, District Judge.[*]

BOGGS, Circuit Judge.

Plaintiffs Richard L. Fitzpatrick, Roger A. Ruppal, and Richard J. Victorson appeal the district court's grant of a motion to dismiss in this civil rights complaint for sex discrimination against males under the State of Michigan's affirmative action plan. We affirm the dismissal of appellants Ruppal and Victorson based upon the statute of limitations, reverse the district court's summary affirmance of the plan based upon constitutional grounds, and remand for further factual development on the actual operation of the affirmative action plan in the circumstances of this case.

I

Appellant Fitzpatrick is a civil servant employed by the Michigan Department of Transportation (MDOT). He now occupies a position classified by Civil Service as a Property Specialist VI. In February 1987, a vacancy occurred for the position of Property Specialist VIII in Oakland County. This position requires a Bachelor's Degree in Business Administration or related field and a Michigan real estate broker's license. However, certain combinations of education and experience can be considered as equivalent to the Bachelor's Degree. Fitzpatrick applied for this position, but it went to C. Mary Carlisle, who has more than twenty years of experience with MDOT, including many years in the positions of Right Way Agent and Property

* The Honorable Henry R. Wilhoit, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Specialist, and is a licensed real estate broker.

At the time of Carlisle's promotion, five non-handicapped white males, one handicapped white male, one black male and one black female occupied positions classified by Civil Service as Property Specialist VII, VIII, IX, or X in the Oakland County office of MDOT. Fitzpatrick applied for six other promotions between October 5, 1987, and June 10, 1988. Five of these appointments went to white males. However, Fitzpatrick challenges the Carlisle appointment as a violation of 42 U.S.C. § 1983 and the fourteenth amendment to the United States Constitution, claiming that Carlisle was selected for the position because of her sex.

Appellant Ruppal is a State civil servant employed by the Michigan Department of the Treasury ("Treasury"). He now holds the position of Auditor X, which he attained in 1988. However, he sought the same position in September 1984, but it went to a white female, Joanna Siegla. Ruppal challenges this promotion under 42 U.S.C. § 1983 and the fourteenth amendment.

Appellant Victorson was hired by Treasury in 1967 as a high school graduate, before there was any requirement for a college degree for upper-level positions. In the early 1980s, Victorson applied three times for the position of Auditor IX. Two of those positions went to other males, while one went to the aforementioned Ms. Siegla. Victorson challenges this promotion under 42 U.S.C. § 1983 and the fourteenth amendment. Subsequently, appellant Victorson also applied for two Auditor IX openings which went to males and two Auditor X positions which went to white females.

Appellants challenge the appointments as being impermissibly motivated by sex because of the operation of the State of Michigan's "affirmative action plan," which appellants claim is a violation of 42 U.S.C. § 1983 and the fourteenth amendment. The evolution of this plan began some eighteen years ago.

In 1971, defendant State of Michigan conducted a "review" of employment opportunities for women and minorities, resulting in the publication of a report. As stated in the introduction, the report's conclusions were "predicated on the premise that the effectiveness of an equal employment opportunity program can be readily measured by the representation or lack of representation of all segments of the population in all grade levels in all departments and in all areas." However, the introduction also noted that "geographic location and bona fide education and experience requirements were significant factors in the employment patterns."

The summary of the report provides both statistical data on the composition of the workforce in various jobs by race and sex, and statements that women or minorities are "under-represented" in particular fields. The study is not explicit as to what constitutes under-representation, although most of the language seems to measure it with reference to the general population (with additional refinements for geographic and educational requirements in some cases).

As to specific findings of discrimination, the report only stated that the examination process has been applied unfairly in the past to fill positions in the state and that several department spokesmen had noted that "provisional appointees who were considered satisfactory employees were unable to pass the prerequisite examination." (1971 report, p. 12). Furthermore, the report alleged several instances of "stereotyped" attitudes among persons who made hiring decisions. However, the report also noted that "it was impossible to determine how many non-whites were rejected by department personnel." *Ibid.*

The report and its recommendations generally created no binding procedures, and at the time were no more than guidelines. At no place in the recommendations is there any suggestion that non-white or female applicants are to be preferred over white male applicants. Instead, the recommendations focus on areas in which the causes of "discriminatory" inequities can be corrected, i.e., reduced use of merit tests, recognition of equivalent job experi-

ence, modifications of confusing applications, or fairer publicity for job openings.

However, the report also recommended that each department "formally commit itself to achieving an employment pattern that is representative of all segments of the population on all levels in all areas ..." Furthermore, the report recommended that no provisional appointment (an appointment done outside regular channels) "be made from an applicant pool that is not representative of all segments of the community." (emphasis added)

This report was used as a predicate for the 1980 "Affirmative Action Guidelines for Equal Employment Opportunity in State Government." This publication, promulgated by the Michigan Equal Employment and Business Opportunity Council (MEEBOC), directed every state agency to adopt affirmative action plans in which goals and timetables were used to correct "deficiency in utilization" of women and minorities. "Underutilization" is defined as having fewer members of a protected category than would reasonably be expected by their availability for the job. This is calculated by looking at population percentages for minority groups and labor force percentages for women and "handicappers" with appropriate "validated" modifications for certain positions that have higher level qualifications. If "underutilization" is present, the 1980 guidelines state that "prima-facie discrimination" is made out, presumably justifying the imposition of a remedy.

The guidelines direct that preference be given to "underutilized" candidates if other things are equal within an applicant pool where unfair tests have been eliminated. However, this "equality" is not defined.

In implementing these guidelines, the MDOT's latest progress reports, taken from its 1986–87 affirmative action plan, recognize that availability of members of underrepresented groups is minimal in certain technical areas. However, the percentages utilized indicate that the department is still apparently trying to correct for underutilization based on general population and workforce statistics.

Appellants and plaintiff Richard Conlin filed their Section 1983 complaint on April 27, 1988. In Count I of their complaint, appellants attacked the defendants' Affirmative Action Policy for the Michigan classified civil service under the fourteenth amendment and 42 U.S.C. § 1983. Count I further alleged that the MEEBOC established affirmative action goals which mirrored the general population of women and minorities in the state. Count I alleged this to be illegal because it was allegedly formulated without evidence of prior discriminatory employment practices, and because it had no set time for a remedial goal to be accomplished. In both Counts II and III, plaintiffs attacked the Affirmative Action Plans of the Treasury and the MDOT specifically.

Appellants Ruppal and Victorson had previously filed an action in Oakland County Circuit Court. In the state case, both plaintiffs alleged that the departmental affirmative action plans violated the Fourteenth Amendment and its counterpart in the Michigan Constitution, Const.1963, art. 1, Section 2. Both parties requested declaratory and injunctive relief, and Victorson sought back pay.

The constitutional issues in the state case have not been adjudicated. When the federal action was commenced, the parties to the state case stipulated to a state court order that the trial of the consolidated cases would be adjourned because of the related pending federal case, but would remain on the court's standby list.

The appellees filed a motion for dismissal and/or summary judgment, raising issues of res judicata, standing, statute of limitations, and abstention. Concurrent with that motion, appellees moved to stay discovery.

At a hearing on July 21, 1988, after staying discovery, the district court dismissed plaintiff Conlin on the basis that he had not shown that he was eligible for the promotion that he challenged. The district court also dismissed Ruppal and Victorson based upon the statute of limitations and held that if it had not dismissed plaintiffs Ruppal and Victorson based upon the stat-

ute of limitations, it would have abstained. Shortly after this, the appellants submitted a motion to amend their complaint in order to add further examples of promotions denied to other white males. The district court dismissed this motion on September 2, 1988, construing the motion to amend as a motion for reconsideration.

As for appellant Fitzpatrick, the district court ordered the constitutional issues briefed and held a hearing on this issue on September 15, 1988. At this hearing, the district judge dismissed the complaint, finding sufficient predicate for any affirmative action that may have been involved in the appellees' hiring practices.

Before this ruling, appellant Fitzpatrick also sought to disqualify Judge Gilmore based upon his relationship with two of the defendants. This was heard by Judge Feikens and denied.

## II

Appellants Ruppal and Victorson claim that the district court incorrectly dismissed their claim based on the statute of limitations, contending that there was a pattern of continuing violations that continued well within the limitations period. Furthermore, appellants contend that if their original claim did not correctly specify the pattern, it was an abuse of discretion for the district court to not allow appellants to amend their complaint to add other specific acts that occurred within the time limit.

Both parties agree that the proper statute of limitations to apply for 42 U.S.C. § 1983 is the Michigan three year statute of limitations period for general tort actions. *See Browning v. Pendleton, et al.,* 869 F.2d 989 (6th Cir.1989) (en banc); M.C.L. Sec. 600.5805(8). In the complaint, appellant Ruppal challenged the refusal to promote him in September 1984, whereas appellant Victorson challenged the denial of a promotion in July 1983. The lawsuit was filed in April 1988, so the promotions specifically challenged fall outside the stat-

ute of limitations period. We hold that appellants have also failed to prove a continuing violation.

In order to allege a continuing violation with regard to employment decisions, a court is to look at what event " 'should have alerted the average lay person to protect his rights.' " *Dumas v. Town of Mount Vernon, Ala.,* 612 F.2d 974 (5th Cir.1980) (quoting *Elliott v. Sperry Rand Corp.,* 79 F.R.D. 580, 585 (D.Minn.1978)). In *Dumas,* the Fifth Circuit rejected plaintiff's allegations of a continuing violation, and upheld the dismissal of a Title VII claim because the plaintiff had filed an identical charge with the EEOC years earlier, indicating that she knew that a violation had occurred.

In the present case, appellants complaint alleged that the policies of the Michigan Civil Service, MDOT, and Treasury, previously and now, violate the fourteenth amendment. However, appellants were certainly aware of the general affirmative action policies at the time of their promotion denials. Indeed, both appellants filed state court actions as early as 1986, showing that at least at that time, they realized that their rights might have been violated.

Even amending their complaint to allege other discriminatory acts would not have helped them, since these alleged acts were directed at other people.[1] Therefore, the district court correctly dismissed Ruppal's and Victorson's claim based upon the applicable statute of limitations. We now turn to the constitutional issue as it concerns Fitzpatrick.

## III

Appellant Fitzpatrick challenges the district court's summary dismissal of his case, contending that Michigan's affirmative action plan is unconstitutional because it is not based upon a showing of past discrimination and/or not narrowly tailored to rem-

---

**1.** Even if such an amendment could have brought the appellants within the statute of limitations, it was not an abuse of discretion for the district court to deny this request since the court

stated the basis for its denial and considered the prejudice to the other party and factors of justice. *See Ellison v. Ford Motor Co.,* 847 F.2d 297, 300 (6th Cir.1988) (per curiam).

edy past effects of discrimination. Therefore, appellants claim, the remedial measures violate the fourteenth amendment.

In order for a race or sex based remedial measure to withstand scrutiny under the fourteenth amendment there must first be some showing of prior discrimination by the governmental entity involved, and second, the remedy adopted by the state must be tailored narrowly to achieve the goal of righting the prior discrimination. *Wygant v. Jackson Board of Education*, 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986). Under the first prong, a governmental entity may find evidence of discrimination based upon statistical differences between those employed by the political entity and the relevant labor pool of those who are "qualified to undertake the particular task." *City of Richmond v. J.A. Croson Co.*, ——, U.S. ——, ——, 109 S.Ct. 706, 725, 102 L.Ed.2d 854 (1989) (citing *Hazelwood School Dist. v. United States*, 433 U.S. 299, 308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977)).

■ In the present case, race or sex based criteria are to be used by the MDOT only if "underrepresentation" exists—that is, if there is a statistical difference between the racial makeup of those people employed by the MDOT in a certain job, and those employed in the relevant labor market.

At the time of Carlisle's promotion, the record before us indicates that there was a statistical difference between the number of women employed at the level of Property Specialist VIII and the relevant labor pool as determined by the state. Furthermore, the state of Michigan admitted at oral argument that there was underrepresentation at the Property Specialist VII level of the MDOT, and therefore the state argued that "affirmative action" could be used in hiring. If the comparison was done correctly by the state, we believe that the evidence provided by these significant statistical differences—both past and present—*could* be enough, when considered in the light of all other evidence, to satisfy the state's burden of proving past discrimination as a predicate for affirma-

tive action under *Croson*. However, the district court did not address the issue and we do not have an adequate factual record before us to make a judgment as to whether the correct relevant labor pool was used, nor do we have any detailed findings as to how the 1971 report addresses the requirements for an adequate finding of past discrimination in *Hazelwood School Dist. v. United States*, 433 U.S. at 308–13, 97 S.Ct. at 2742–44, and *Croson*, 109 S.Ct. at 714, 723–25. See *Assoc. Gen. Contr. Cal. v. City and Co. of San Francisco*, 813 F.2d 922, 930–32 (9th Cir.1987).

Furthermore, we do not have sufficient evidence before us to determine whether the remedy employed by the state of Michigan in the present case is constitutional. As stated earlier, any remedy which uses sex or race must be narrowly tailored, to survive scrutiny under the fourteenth amendment. *Wygant*, 476 U.S. at 274, 106 S.Ct. at 1867.

The state of Michigan conceded at oral argument that, under its affirmative action plan, when two or more candidates meet the "minimal" qualifications for a job, then sex may (but need not) be the sole factor in a hiring decision. Although we make no judgment at this time as to how any remedy was actually applied in this case, or may be applied by those who administer the affirmative action plan, we note that such a remedy could conceivably stray far afield from the past discrimination it seeks to correct. For example, if the range of applicants from minimally qualified to very qualified is a broad one, the state may simply set the required "qualifications" as low as it pleases to justify any sex-based hires.

At one extreme, "equality of other factors" in a job selection decision may simply mean that under-representation status may be used as a "tie-breaker" after literally all other factors have been considered and found to be equal. This would not even meet the "but-for" standard for prima-facie discrimination that was found to exist in *Johnson v. Transp. Agency, Santa Clara Cty., Cal.*, 480 U.S. 616, 107 S.Ct. 1442, 1469, 94 L.Ed.2d 615 (1987). If

sex only operated as a "tie-breaker," then the losing candidate might not have prevailed even in the absence of its use.

Going further, "extra credit" for a favored group might be given in a variety of ways, ranging from explicit numerical preference, such as the Veterans preference system used in federal Civil Service, to unquantified preference such as choosing a member of an under-represented group when the person is "almost" as good as the highest-ranking candidate. This may have been the case in *Johnson*, 107 S.Ct. 1447, 1448.

At the other extreme, "equality of other factors" may mean that a member of an under-represented group should be chosen any time that such a person is included in the applicant pool by meeting the "minimum" qualifications required to become a member of the pool. However, because discovery was truncated, we have no idea, as conceded by both counsel at oral argument, of the exact operation of the affirmative action plan in this particular case.

Therefore, we must remand the case to the district court for an evidentiary hearing to determine to what extent, if any, sex was considered in the hiring of Ms. Carlisle. If sex was not considered at all, then of course no discrimination occurred. *Johnson*, 107 S.Ct. at 1449. Furthermore, if sex were only a "tiebreaking" factor in a decision in which qualifications were not too disparate, then the remedy may be considered narrowly tailored, and would not violate the fourteenth amendment under the standards of *Johnson*.

Therefore, the decision of the district court dismissing appellant Fitzpatrick's claim is REVERSED and REMANDED for further proceedings consistent with this opinion.[2,3] The decision of the district court is AFFIRMED in all other respects.

2. Appellees' motion to dismiss appellants Ruppal and Fitzpatrick from this appeal because of mootness is denied. With respect to appellant Ruppal, the motion is moot due to this court's decision upholding the district court's dismissal based upon the statute of limitations. With regard to appellant Fitzpatrick, he is seeking back wages in a similar state court action which may be affected by the outcome of this case. Therefore, his interest in the outcome is real, and the appeal is not moot.

Appellees' motion to strike parts of appellants' brief is also denied.

3. Appellant's argument that Judge Gilmore should have recused himself is without merit. Appellant's only evidence of any alleged partiality is an affidavit of appellant Fitzpatrick that Gilmore had worked politically with several of the named defendants many years ago. Said defendants were named in their official capacity only and have no direct monetary stake in the outcome of the decision. In order for Judge Gilmore's impartiality to be questioned, the moving party's affidavit must show that a reasonable person would question the impartiality of Judge Gilmore. *See Roberts v. Bailar*, 625 F.2d 125, 128, 129 (6th Cir.1980). On the evidence before us, we cannot say that Judge Feikens was clearly erroneous in finding that Judge Gilmore's impartiality could not reasonably be disputed.