Richard F. CONLIN, Richard
L. Fitzpatrick, Roger A. Ruppal,
and Richard J. Victorson, Plaintiffs,

v.

James J. BLANCHARD, Governor of the
State of Michigan; Martha W. Grif-
fiths; Frank J. Kelley; John Roy Cas-
tillo; John F. Hueni; Robert H. Nafta-
ly; Doug Ross; Elizabeth P. Howe;
James P. Pitz and C. Patrick Babcock,
members of the Michigan Equal Em-
ployment and Business Opportunity
Council (MEEBOC); John F. Dodge,
Jr.; Walter R. Greene; Patricia B.
Johnson and Alan A. May, members of
the Michigan Civil Service Commission;
Dorothy Haener; Benny Napoleon;
Beverly Clark; Sondra L. Berlin; Eva
Evans; Michael C. Hidalgo; Rev. Wil-
liam Holly and Philip Van Dam, mem-
bers of the Michigan Civil Rights Com-
mission; Robert A. Bowman, State
Treasurer; James A. Pitz, Director of
the Michigan Department of Transpor-
tation, and the State of Michigan, De-
fendants.

No. 88-CV-71578-DT.

United States District Court,
E.D. Michigan, S.D.

Aug. 30, 1990.

Charles J. Porter, Bloomfield Hills, Mich., for plaintiffs.

Dianne M. Rubin, Asst. Atty. Gen., Detroit, Mich., for defendant Civil Rights Com'n Members.

Deborah Anne Devine, Asst. Atty. Gen., State Affairs Div., Lansing, Mich., for defendants Blanchard and MEEBOC Members.

Leo H. Friedman, Asst. Atty. Gen., Natural Resources Div., Lansing, Mich., for defendants Robert A. Bowman and James P. Pitz.

Scott Moore, Southfield, Mich., for defendants Members of Civil Service Com'n.

## OPINION

GILMORE, District Judge.

At issue in this case is the validity under the Fourteenth Amendment of the Affirmative Action Plan of the Michigan Department of Transportation (MDOT) and, inferentially, the affirmative action policies of the entire State of Michigan. For the reasons stated herein, the Court finds that Plaintiff has no basis for complaint under the Fourteenth Amendment, and that MDOT's Affirmative Action Plan and the State's affirmative action policies are clearly Constitutional under all Supreme Court precedents. For the reasons set forth in this opinion, the Complaint will be dismissed.

### I

This matter is before the Court upon remand from the Sixth Circuit in *Conlin v. Blanchard,* 890 F.2d. 811 (6th Cir.1989).[1] Fitzpatrick claims that his Fourteenth Amendment rights were violated when MDOT, in 1987, promoted Mary Carlisle to the position of Property Specialist VIII instead of him. He contends the promotion was based upon Carlisle's sex, and therefore was discriminatory. He attacks the entire Affirmative Action Plan of MDOT and the affirmative action policies of the State.

The Sixth Circuit remanded the matter to this Court for an evidentiary hearing to determine to what extent, if any, sex was considered in the hiring of Carlisle. The Court stated: "If sex was not considered at all, then of course no discrimination occurred. *Johnson* [*v. Transportation Agency, Santa Clara Cty., Cal.,* 480 U.S. 616], 107 S.Ct. [1442] at 1449, [94 L.Ed.2d 615 (1987) ]. Furthermore, if sex were only a 'tie-breaking' factor in a decision in which qualifications were not too disparate, then the remedy may be considered narrowly tailored, and would not violate the Fourteenth Amendment under the standards of *Johnson.*" *Conlin, supra,* at 817. Pursuant to the order of remand, this Court has conducted a full evidentiary hearing and finds no violation of the Fourteenth Amendment.

### II

#### A. *Facts Giving Rise to Plaintiff's Claim*

Fitzpatrick was a classified civil servant employed by MDOT as a Property Specialist VI. He began his employment with MDOT in May, 1965. In 1987, a vacancy occurred in a position classified as Property Specialist VIII in the Metro District. Fitzpatrick had held this position in an acting capacity from October 1, 1986, to June 26, 1987. However, Carlisle was selected to fill the position permanently. The record showed that while acting as Property Specialist VIII, Fitzpatrick had difficulty carrying out his duties without direct supervision, and failed to complete certain duties and projects. Testimony further showed that Carlisle's performance as

---

1. In prior proceedings, the Court had dismissed the entire case on summary judgment. The Sixth Circuit affirmed the dismissal as to all plaintiffs except Fitzpatrick, and the matter is before this Court now only as to Plaintiff Fitzpatrick.

Property Specialist VIII has been superior to Fitzpatrick's performance when he held the position in an acting capacity.

The Civil Service education and experience requirements for this position were that the applicant have a bachelor's degree, with a minor in real estate, and two years professional experience, equivalent in responsibility to a Property Specialist VI(b), or one year professional experience equivalent to the responsibility of a Property Specialist VII. Equivalent combinations of educational experience could be substituted for a bachelor's degree upon individual determination by the Department of Civil Service.

Fitzpatrick and four other candidates were interviewed for the position of Property Specialist VIII. To determine the candidates to interview, MDOT advertised the position and obtained an employment list from the Civil Service Commission (CSC).[2] Based upon the response to the advertisement and CSC's list, MDOT determined the certifiable and eligible applicants interested in the vacancy. Fitzpatrick and four other candidates, including Carlisle, were interviewed for the position by a panel consisting of senior MDOT officials in the property specialist area.

At the end of the interview process, Carlisle, a white female, was unanimously recommended for the position and subsequently appointed. Carlisle had more than 20 years experience with MDOT, including many years in the position of Right–of–Way Agent and Property Specialist; she possessed a real estate broker's license. She did not have a college degree, but was deemed eligible by CSC because of her equivalent education and experience. At the hearing, two members of the interview panel testified that she was more qualified than Fitzpatrick for the position because of her organizational ability and her ability to take over a project and see it through from beginning to end.[3] The interview panel found that Carlisle demonstrated good skills in organizing her work, in writing, in dealing effectively with others, and in working independently of constant supervision. The record shows unequivocally that no one told the interview panel that they had to select a woman, and that the panel was not directed to appoint a female or any other protected person to the position. Augmented certification, which will be discussed in detail, *infra*, pp. 418 *et seq.*, was used to place Carlisle in the candidate pool for this appointment. Pursuant to the State's policy, the interview panel that recommended Carlisle's appointment did not know that augmented certification had been utilized.

### B. *Authority to Make the Hiring Decision*

The Civil Service Commission of the State of Michigan is a constitutional body created by the Constitution of 1963, Article XI, Section 5. Pursuant to the Michigan Constitution, CSC is the certifying authority in employment decisions, certifying the qualifications of all applicants for State jobs. The relevant provision of the Michigan Constitution provides:

> The Commission shall classify all positions in the classified service according to their respective duties and responsibilities, fix rates of compensation for all classes of positions ... determine by competitive examination and performance exclusively on the basis of merit, efficiency and fitness, the qualifications of all candidates for positions in the classified service ... and regulate all conditions of employment in the classified service.
>
> \*   \*   \*   \*   \*   \*
>
> No person shall be appointed to or promoted in the classified service who has not been certified by the commission as qualified for such appointment or pro-

---

**2.** The manner in which the employment list was made up is one of the central issues in this case, and will be discussed in detail, *infra.* pp. 418 *et seq.*

**3.** It should be noted that Fitzpatrick subsequently applied seven times for appointment as Prop-

erty Specialist VIII, until he finally retired on March 31, 1989. Each time he applied, he was not appointed, and white males were appointed in six of the cases.

motion. No appointments, promotions, demotions or removals in the classified service shall be made for religious, racial or partisan considerations.

Mich. Const. art. XI, § 5.

In contrast, MDOT is the appointing authority. It has the authority to hire, fire, and promote eligible employees in accordance with the rules of CSC. CSC certifies eligible candidates to MDOT, but the final decision to select among candidates certified eligible by CSC is vested in MDOT. However, MDOT, as appointing authority, has no authority to set qualifications, classify positions, or set rates of compensation.

### C. Factual Predicate for the State's Affirmative Action Program

The State has a policy of equal employment opportunity,[4] implemented through executive orders and directives of the Governor and the CSC rules and procedures. MDOT and other agencies, in accord with these rules and procedures, implement individual Affirmative Action Plans (AAPS)[5], which are designed to achieve equal employment opportunity.

On August 26, 1969, then Governor Milliken directed that the Civil Rights Commission (CRC) of Michigan and CSC conduct a comprehensive review of employment practices in State government. This review resulted in the submission of a formal report entitled "Employment Practices Review and Recommendation" to the Governor in August of 1971. (Exhibit 101). The report concluded that MDOT and other State departments had an underrepresentation of women and other protected groups in higher level positions.[6] As early as 1964, CSC began to evaluate the presence of protected group members in State government. This evaluation revealed that the number of protected group members employed by the State were not in any way reflective of the group's representation within the State. It further found that, generally, members of protected groups who were employed were concentrated in a few State agencies, in low level jobs with respect to both responsibility and pay. Moreover, the review found: 1) that there was a gross disparity in the representation of women and minorities in each department; 2) that there was occupational segregation; and 3) that CSC selection and classification procedures created artificial barriers to the hiring and promotion of protected group members.

The report also found that, as of January 1971, females constituted 47.8 percent of all State classified employees, ranging from 7.3 percent in the Department of the Auditor General to 69 percent in the Department of State, with disparate representation in the lower levels. Women were represented in only 640 of the 2,160 classes of employees. White women were represented in less than 30 percent of all classes and found exclusively in less than 90 classes. Nonwhite women were found in less than half as many classes, and exclusively in only nine classes. Despite the enactment of the Fair Employment Practices Act in 1955, and passage of a Constitutional provision in 1963 setting up the CRC, nonwhites and women, to a large extent, appeared to be hired in lower level openings or in other open positions only when someone within the hiring agency or CSC exerted an effort in favor of such appointments.

With respect to MDOT, the joint report found that there was one black male and no females holding 115 supervisory positions at Level XV or above. It also found that, out of 1,073 non-professional technicians, only one technician was female, and only 46 were black. It found that over 80 percent of the 576 female employees in MDOT were classified at the 05 level or below,

---

**4.** Equal employment opportunity is defined as the use of practices, policies and procedures that will afford everyone an equal opportunity in employment.

**5.** Affirmative action is defined as specific remedial action taken to provide remedies to groups

that the employer has a firm basis to believe have been discriminated in the past based on race and sex.

**6.** The other protected groups are blacks, Asians, American Indians, Hispanics, and handicappers.

compared to less than 30 percent of the 4,273 male employees.

Following this study, Governor Milliken issued an executive order that established a policy of equal employment opportunity within the classified Civil Service.

In 1975, the Governor issued an executive directive affirming the State policy of equal employment opportunity. The policy was to be effectuated through the appointing authority's affirmative action programs applicable to all aspects of personnel policy and practice. The order established the Michigan Equal Employment Opportunity Council (MEEOC) to advise the Governor regarding equal opportunity progress, and, pursuant to this order, each department submitted voluntary AAPs to MEEOC for approval.

In 1976, MEEOC endorsed the principal of voluntary affirmative action contained in the memorandum of the Federal Employment Opportunity Coordinating Council, dated August 26, 1976, and in May 1979, the Governor issued another executive directive continuing the existence of MEEOC, noting the progress that had been made, setting forth the duties and responsibilities of MEEOC and the State Department, and requesting the Civil Service and Civil Rights Commissions to continue their review.

In 1982, Governor Milliken issued another executive order continuing the existence of MEEOC and reaffirming the State's commitment to equal opportunity. In 1983, Governor Blanchard issued an executive order establishing the Michigan Equal Employment and Business Opportunity Council (MEEBOC), which replaced MEEOC.

On May 22, 1985, Governor Blanchard issued an executive order that required each department, agency, and commission to establish and maintain an affirmative action program to achieve and insure equal employment opportunity, and confirmed the State's commitment to affirmative action so as to insure proper representation of protected group members within State government. This executive order provided that the appointing authorities were to follow guidelines issued by MEEBOC to insure equal opportunity in all practices implemented by the State, and required the submission of the early AAPs by each department for gubernatorial review.

### D. *Conditions in MDOT*

In the 1971 review of the Michigan State Classified Service *supra*, the underrepresentation of women in the Highway Department was clearly pointed out.[7] On page 11–3 of that report, it said, with reference to the Department of Highways:

> While this review was not formally charged with the responsibility of reviewing the extent to which equal opportunities are extended or denied to women employees, the fact that over 80 percent of 576 female employees were classified at the 05 level or below, compared with less than 30 percent of the 4,273 male employees, did not escape notice.

In a study made in October of 1986, the situation was not substantially different. MDOT's affirmative action goals show that in the professional class, as of October 6, 1986, there were eight females employed, and an underutilization of 32 females. (Defendant's Exhibit 118). To reflect the labor market, there should have been 40 women employed in the work pool of 81. Similar or greater underutilization was found in the Metropolitan District of the Transportation Department, among Bureau of Highway technicians, and in every other category within MDOT.

At the time of Carlisle's appointment to Property Specialist VIII, there were 11 male Property Specialist VIII, and no females. In the category of Property Specialist VII, there were 16 males and one female. In the category of Property Specialist VI, there were 11 males and six females. In the higher grades of the position, there were six males and four females as Property Specialists IX, seven males and

---

7. The Department of State Highways has been redesignated the Michigan Department of Transportation, or MDOT.

no females as Property Specialist X, and three males and no females as Property Specialist XI. (Defendant's Exhibit 128.)

These figures make clear that there was a great underrepresentation of female workers, both in the professional and technical classes, and specifically in the Property Specialist VIII category. In fact, in all of the Property Specialist classifications, there was a great underutilization and underrepresentation of women.

The testimony at trial showed that 50 percent of the entire labor force is made up of women. With reference to occupational specialties, the record showed that, in 1987, 48.52 percent of people in the real estate sales occupation in Oakland County were women, and State-wide, 43.35 percent in the real estate sales occupation were women. *Dictionary of Occupational Titles.* By definition, women in real estate occupations is the closest to Property Specialist VIII. Therefore, it appears that a goal of 50 percent of women in Property Specialist VIII is not contrary to the relevant labor market.

### E. *Augmented Certification*

Underutilization[8] of protected classes triggers the use of various affirmative action mechanisms permitted under the AAPs and under Civil Service Rules. The underrepresentation must exist in the class, class series, or job category within the department or agency in the geographical location of the position to be filled, in accordance with standards established by MEEBOC. One mechanism used to address underrepresentation is augmented certification, the procedure Plaintiff attacks as unconstitutional. Augmented certification is best explained as a process used to place members of protected classes in the pool of applicants considered for a given position.

The general procedure for appointment is that, after a written examination by the

CSC, CSC rates candidates as highly qualified, qualified, or unqualified. There must be at least three candidates in the highly qualified rating or "band" for an appointment or promotion to be made. The list of qualified candidates is then forwarded to the hiring agency for interviewing. If there are not three persons of the highly qualified band in the list to be forwarded to the agency, then all highly qualified and qualified candidates are interviewed for the opening. When there is underrepresentation of a protected group in the particular job to be filled, there must be at least three persons of a protected group in the highly qualified band for a choice to be made. If there are not three persons in the highly qualified band on the list to be forwarded to the Agency, then qualified protected group members are added, or augmented, to the highly qualified band. This addition is called augmented certification. When these names are added to the highly qualified band, and the list is sent to the appointing authority, the appointing authority does not know which names on the list were added to the highly qualified band because of augmented certification. This is to assure that protected group members are equally considered in the selection process.

For example, in the present case, there was an underrepresentation of women in the highly qualified category on the list for Property Specialist VIII. Consequently, the names of two women who were in the qualified band, including Carlisle, were added to the highly qualified list, and this augmented list was sent to MDOT. If Carlisle and two other women had scored in the highly qualified, or first, band, then augmented certifications would not have been used, because there would have been at least three members of the underutilized protected group in the list of highly qualified candidates.

---

**8.** As pointed out in the opinion of the Sixth Circuit in *Conlin, supra:*

"Underutilization" is defined as having fewer members of a protected category than would reasonably be expected by their availability for the job. This is calculated by looking at

population percentages for minority groups and labor force percentages for women and "handicappers" with appropriate "*validated*" modifications for certain positions that have higher level qualifications.
*Conlin,* at 814.

The purpose of augmented certification is to insure that artificial barriers are not erected to preclude the consideration of qualified protected group members for promotion. Only those who score in the qualified band are considered through augmented certification. No one who is not qualified would be placed on a list through augmented certification. Once a person is placed on the list through augmented certification, the affirmative action mechanism does not require the appointment of a protected group member.

### F. *MDOT's Long and Short Term Goals Underlying Its Affirmative Action Plan*

In considering the percentages of women necessary to trigger affirmative action, it is necessary to look at both long- and short-term goals of MDOT, and, because of the case law discussed *infra*, to consider the labor market and the relevant labor market.

MDOT used the 50 percent women in the work force figure to trigger augmented certification, and contends it would have made no difference if it had used the relevant labor market because that figure is 48.52 percent. It is the Defendant's position that it is proper to use women in the work force as a long-term goal, as long as women in the relevant labor market is used for short-term goals—the goals by which the State does its hiring and promotion. Defendant's rationale is that, if everything were equal, the labor market would reflect the percentages of groups in the population. However, that figure is unrealistic because of the effects of discrimination.

Defendant contends, for example, that, since the population of women in the work force in the State of Michigan is 50 percent, without discrimination, we could expect that women in any category, including, for example, lawyers, would be 50 percent. However, in determining whether specialist groups, like lawyers, should have 50 percent women to meet affirmative action goals, one must look at how many individuals in the specialist group are female. One cannot expect one-for-one hiring, if there are not that many females available in the particular category. If, for example, one is hiring lawyers, and only 30 percent are female, then, to meet the relevant labor market figures, one should hire 30 percent female lawyers. However, MDOT argues the next year it may be that 40 percent of the lawyers are female, and so on, until eventually the composition of lawyers would represent not only the percentage of female attorneys, but also the percentage of females in the labor force. Thus, MDOT contends, it is proper to use women in the work force as a long-term goal as long as women in the relevant labor market is used for the short-term goals that govern hiring and promotion.

### III

Having considered the facts in the case and the background and purposes of MDOT's Affirmative Action Plan, it is now necessary to analyze the Sixth Circuit's opinion in *Conlin* and relevant authority from the United States Supreme Court to determine if the affirmative action plan of the State of Michigan, and particularly of MDOT, meets Constitutional standards under the Fourteenth Amendment.

As the Court in *Conlin, supra,* pointed out:

> In order for a race or sex based remedial measure to withstand scrutiny under the fourteenth amendment, there must first be some showing of prior discrimination by the governmental entity involved, and second, the remedy adopted by the state must be tailored narrowly to achieve the goal of righting the prior discrimination. *Wygant v. Jackson Board of Education,* 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986). Under the first prong, a governmental entity may find evidence of discrimination based upon statistical differences between those employed by the political entity and the relevant labor pool of those who are "qualified to undertake the particular task." *City of Richmond v. J.A. Croson Co.* [488] U.S. [469] [502] 109 S.Ct. 706, 725, 102 L.Ed.2d 854 (1989) *(citing Hazelwood*

*School Dist. v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977)).

*Conlin* at 816.

The Court further stated:

At the time of Carlisle's promotion, the record before us indicates that there was a statistical difference between the number of women employed at the level of Property Specialist VIII and the relevant labor pool as determined by the state.... If the comparison was done correctly by the state, we believe that the evidence provided by these significant statistical differences—both past and present—*could* be enough, when considered in the light of all other evidence, to satisfy the State's burden of proving past discrimination as a predicate for affirmative action under *Croson.* However, ... we do not have an adequate factual record before us to make a judgement as to whether the correct relevant labor pool was used....

*Id.* at 816.

In *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), the Court outlined the constraints the Fourteenth Amendment imposes upon voluntary affirmative action programs. It held that, in the context of affirmative action, racial classifications must be justified by a compelling State purpose and the means chosen by the State to effectuate that purpose must be narrowly tailored.

There are two prongs to this examination. First, any racial classification "must be justified by a compelling governmental interest." Second, the means chosen by the State to effectuate its purpose must be "narrowly tailored to the achievement of that goal...."

*Wygant, supra,* at 274, 106 S.Ct. at 1847 (citations omitted).

The Court further pointed out:

This Court never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination. This Court's reasoning in *Hazelwood School District v. United States,* 433 U.S. 299 [97 S.Ct. 2736, 53 L.Ed.2d 768] (1977) illustrates that the relevant analysis in cases involving proof of discrimination by statistical disparity focuses on those disparities that demonstrate such prior governmental discrimination.... the Court in *Hazelwood* held that the proper comparison for determining the existence of actual discrimination by the school board was "between the racial composition of [the school's] teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market." 433 U.S. at 308 [97 S.Ct. at 2742]. *Hazelwood* demonstrates this Court's focus on prior discrimination as the justification for, and the limitation on, a State's adoption of race-based remedies....

*Id.* at 274–75, 106 S.Ct. at 1847.

In *Johnson v. Transportation Agency,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), the Court delineated the constraints imposed by Title VII, 42 U.S.C. § 2000e, *et seq.* The Court noted that, in assessing the legality of an affirmative action plan, an employer seeking to justify the adoption of such plan need not point to its own prior discriminatory practices, but need point only to a conspicuous imbalance in traditionally segregated job categories.

The Court stated:

In determining whether an imbalance exists that would justify taking sex or race into account, a comparison of the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population is appropriate in analyzing jobs that require no special expertise.... Where a job requires special training, however, the comparison should be with those in the labor force who possess the relevant qualifications.

*Id.* at 631–32, 107 S.Ct. at 1452.

Both *Johnson* and *Wygant* follow and affirm the Supreme Court's decision in *United Steel Workers v. Weber,* 443 U.S.

193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), which specifically held that a voluntary affirmative action plan is a permissible means by which to remedy the effects of past discrimination. In determining the validity of such plans, the Court asked whether the adoption of the plan was justified as a remedial measure, and whether the plan unnecessarily trammeled the legitimate interests of non-minority employees. The Court pointed out that the interests of white employees were not unduly trammeled because there was no absolute bar to their promotion, the plan did not require the discharge of any employees, and the plan was merely a temporary measure designed to obtain, but not maintain, a racial balance in the work force. *Id.* at 208, 99 S.Ct. at 2729.

In *Johnson,* it was pointed out that the plan adopted there did not unnecessarily trammel the rights of male employees, or create an absolute bar to employment. There, the plan set aside no positions for women, the agency head was authorized to promote any of the eligible qualified candidates, and thus denial of promotion to a male employee unsettled no legitimate firmly-rooted expectation of employment. The male employee in that case retained his employment and salary, remained eligible for promotion, and the plan was not intended to maintain a permanent balance in the work force. *Johnson,* 480 U.S. at 638–39, 107 S.Ct. at 1455–56.

■ These cases also make clear that Plaintiff bears the burden of proof to establish the invalidity of the plans under both Title VII and the Fourteenth Amendment. *Wygant, supra, Johnson, supra.* Under *Johnson,* the inquiry was whether there existed a manifest imbalance in traditionally segregated job categories, while in *Wygant,* the Court looked at whether the employer had a strong basis and evidence for concluding that affirmative action was necessary to remedy the present effects of past discrimination.

■ Finally, to determine the validity of a plan, the two-pronged test announced in *Weber, supra,* must be applied: 1) is there an adequate factual predicate to justify the use of affirmative action; 2) if remedial action is justified, does the plan unnecessarily trammel the legitimate interests of unprotected group employees?

## IV

With the law in mind, the Court must now look at the Affirmative Action Plan involved in this case. Plaintiff challenges the augmented certification plan used to place protected group members into the candidate pool. The Court finds nothing unconstitutional under the Fourteenth Amendment in the augmented certification plan.

### A. *Factual Predicate*

■ First, as required by *Weber* and its progeny, there is an adequate factual predicate to justify the use of an affirmative action plan. As is clear from the recitation of facts giving rise to MDOT's AAP and the augumented certification procedure, females were generally underrepresented, and female property specialists were employed by MDOT in statistically significant fewer numbers than their counterparts in the female labor force of comparable real estate positions. The State of Michigan and MDOT had a strong basis, based upon the joint report, to believe that voluntary affirmative action was warranted to address the present effects of past discrimination. Furthermore, MDOT's AAP did not have a time-limit within which a specific number of positions were to be filled by women, and it contained no set-aside of positions. Rather, each authorized consideration of sex as a factor when evaluating qualified candidates for positions in which women were underutilized. Nothing in the affirmative action plan required a 50 percent, or one for one, promotion of females, and, in fact, experience indicates that appointments in the property specialist classification have been heavily male.

### B. *Fifty Percent Labor Market Trigger*

It was argued by Plaintiff that the use of 50 percent women in the work force to trigger augmented certification is contrary to the rule in *Johnson, supra. Johnson*

held that the use of the percentage in the area labor market or general population is appropriate in analyzing jobs that require no special expertise, but where a job requires special training, the comparison should be with those in the labor force who possess the relevant qualifications, or in other words, the "relevant labor market." *Id.* at 632, 107 S.Ct. at 1452.

■ The Court is of the opinion that in this case it made no difference whether MDOT relied on percentages in the work force or the relevant labor market because, according to the *Dictionary of Occupational Titles,* the relevant labor market of women in real estate is 48.52 percent State-wide, and 43.1 percent for Oakland County. Furthermore, under *Johnson,* it is proper to use women in the work force as a long-term goal, as long as women in the relevant labor market is used for short-term hiring goals. The 50 percent MEEBOC standard for females was a long-term goal that the State hoped to achieve by 1975. Given the total absence of qualified females in the applicant pool in 1970, MDOT could only expect gradual increases of women at higher levels, as they were hired and gained the necessary education and experience to be qualified for promotion. The MEEBOC guidelines direct the appointing authorities to consider the relevant labor market when developing their goals. These guidelines also provide direction to the appointing authorities to update the affirmative action programs, to evaluate underutilization, to choose different selection criteria if necessary, and to determine short- and long-term goals.

Today, actual appointments are made by the appointing authority using the short-term goals established in the affirmative action plans, which reflect the availability of qualified candidates, as well as projected vacancies and new hires. To meet short-term goals, the sex of the candidate may be considered as a factor in evaluating qualified candidates in job classifications where underutilization is documented. MDOT's Affirmative Action Plan, including augmented certification, authorizes the use of sex as a factor in the selection process for hiring and promotion only where there is a documented underutilization of a protected group in the job category. The process assures that, once the goal is obtained, remedial measures will be discontinued.

Furthermore, the affirmative action policies of the State and MDOT provide for periodic review of the overall operation, implementation, and success of the plan in achieving its goals, which goals are reviewed as the needs of individual departments are re-evaluated. The affirmative action plans are predicated on an analysis of the current work force and the available labor force, and provide for the promotion of males, as well as protected group members. The goals are temporary, and designed to achieve a representative workforce.

In Fitzpatrick's case, augmented certification was used to place Carlisle on the list of candidates sent to MDOT. However, the interview panel that recommended Carlisle's appointment did not know that augmented certification had been utilized. Fitzpatrick was fully considered by the interview panel, and he remained in the candidate pool, eligible for subsequent appointments. He applied for seven of these. Five were filled by males other than Fitzpatrick, and two by females. Up until the time of his voluntary retirement, Fitzpatrick remained eligible for future appointments.

Evidence taken at the hearing clearly showed that the interview panel unanimously found Carlisle more qualified than Fitzpatrick for the position. Although Carlisle was placed on the list of candidates by augmented certification, the interview panel found her the most qualified person for appointment at the time. Consequently, the Court concludes that sex was not a factor in the panel's recommendation of Carlisle's appointment.

Furthermore, the Court rejects, as false, Fitzpatrick's testimony that, after the appointment was made, Wittenden, one of the members of the interview panel, told him that they had to appoint Carlisle because she was a women. This statement was

denied by Wittenden on the stand, and the Court finds that Wittenden was truthful.

V

In summary, Plaintiff has failed to carry his burden to show that his rights have been unduly trammeled by MDOT's AAP and the State of Michigan's affirmative action policies. He has further failed to demonstrate past, present, or future harm from MDOT's AAP and Michigan's affirmative action policies.

The State, as a public employer, had an affirmative obligation under the Fourteenth Amendment to eradicate the effects of past discrimination clearly shown by the 1971 study. The interests of male employees were not unduly trammeled by the plan because the plan did not create an absolute bar to their promotion, did not require the discharge of employees, and was a temporary measure designed to attain a racial and gender balance in the work force. Although the Court has concluded that sex was not a factor in the panel's decision to promote Mary Carlisle, the Court also concludes that the augmented certification procedure used to place Carlisle on the employment list was narrowly tailored and fully justified by past discrimination in MDOT. The Court finds that the MDOT's Affirmative Action Plan and the State's affirmative action policies meet all Constitutional and Title VII standards.

Therefore, for the reasons given, Plaintiff's complaint will be dismissed.

This opinion shall constitute the findings of fact and conclusions of law required by F.R.C.P. 52(a).